**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

| |
|---|
| In the Matter of the Arbitration Between |
| |
| FORESIGHT LUXEMBOURG SOLAR 1 S.À.R.L. |
| FORESIGHT LUXEMBOURG SOLAR 2 S.À.R.L. |
| GREENTECH ENERGY SYSTEMS A/S (NOW KNOWN AS ATHENA INVESTMENTS A/S) |
| GWM RENEWABLE ENERGY I S.P.A. |
| GWM RENEWABLE ENERGY II S.P.A. |
| |
| Petitioners, |
| |
| v. |
| |
| THE KINGDOM OF SPAIN |
| |
| Respondent. |

**Case No.: 1:19-cv-03171-ER**

---

## PETITIONERS' REPLY IN SUPPORT OF PETITION TO CONFIRM THE ARBITRAL AWARD

James E. Berger
*jberger@kslaw.com*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York, 10036
Tel: 212-556-2202
Fax: 212-556-2222

New York, New York, 10022

*Attorneys for Petitioners*

# TABLE OF CONTENTS

I.  Preliminary Statement ................................................................................................1

II. Factual Background .....................................................................................................3

    A.  Post-Award Proceedings ......................................................................................3

    B.  *Achmea* .................................................................................................................3

III. Argument .....................................................................................................................5

    A.  Spain's Objections to this Court's Jurisdiction are Meritless ..............................5

        1.  This Court Has Subject Matter Jurisdiction Because Spain
            Agreed in the ECT to Arbitrate this Dispute and the New York
            Convention Applies to that Agreement .........................................................5

    B.  Petitioners Served the Petition in Accordance with the Hague
        Convention .........................................................................................................15

    C.  Respondent Fails to Meet its Burden in Showing any of the Article V
        Defenses Under the New York Convention Apply ............................................17

        1.  Spain Agreed to Arbitrate with Petitioners ...............................................17

            2.  The Tribunal Did Not Rule on Anything "Outside the
                Submission to Arbitration" .....................................................................18

        3.  The Award Does Not Violate U.S. Public Policy ......................................19

            4.  The Foreign Compulsion Doctrine Is Irrelevant to these
                Proceedings .............................................................................................21

            5.  The Award Has Not Been Suspended Pursuant to Article
                V(1)(E) ...................................................................................................23

    D.  Spain Has Failed to Provide any Justification for a Stay.................................24

## Cases

*Aguidas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934 (D.C. Cir. 2008) ................... 8

*Alpha Capital Anstalt v. Real Goods Solar*, Inc., 311 F. Supp.3d 623 (S.D.N.Y. 2018) ............ 10

*Arshad v. Trans. Sys, Inc.*, 183 F.Supp.3d 442 (S.D.N.Y. 2016) .................................................. 21

*Banco Nacional De Mexico, S.A. v. Societe Generale*, 820 N.Y.S.2d 588 (1st Dep't 2006) ....... 29

*Barnes v. Am. Int'l Life Assur. Co.*, 681 F. Supp. 2d 513 (S.D.N.Y. 2010)................................... 9

*BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25 (2014)................................................................. 1

*Cargill Int'l v. M/T Pavel Dybenko,* 991 F.2d 1012 (2d Cir. 1993)............................................... 9

*Caribbean Trading & Fidelity Corp. v. Nigerian Nat. Petroleum Corp.*, No. 90-Civ-4169 (JFK), 1990 WL 213030 (S.D.N.Y. 1990) ....................................................................................... 32

*Chan v. Korean Air Lines*, 490 U.S. 122 (1989)........................................................................ 11

*Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200 (D.C. Cir. 2015) ....................................... 8

*Compagnie Noga D'Importation et D'Exportation, S.A. v. The Russian Federation*, 361 F.3d 676 (2d Cir. 2004)........................................................................................................................ 25

*Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp. 2d 46 (D.D.C. 2010) ... 29

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92 (2d Cir. 2016) *("Pemex")* .................................................... 2, 18, 30

*Crescendo Mar. Co. v. Bank of Communs. Co.*, No. 15 Civ. 4481 (JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) ..................................................................................................... 1

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 244 F.Supp. 3d 100 (D.D.C. 2017)...... 23

*Deiulemar Compagnia Di Navigaziona S.p.A v. Transocean Coal Co.*, No. 03 Civ. 2038 (RCC), 2004 U.S. Dist. LEXIS 23948 (S.D.N.Y. Nov. 30, 2004) ......................................................... 2

*Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) ................................................................................................................................... 22

*Europcar Italia, S.p.A. v. Maeillano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998) .................... 25, 31

*First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938 (1995) ................................................... 9

*G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp.2d 132 (D.D.C. 2010)........................ 31

*Gold v. Deutsche Aktiengesellschaft,* 365 F.3d 144 (2d Cir.2004) ............................................... 14

*Hess Corp. v. Dorado Tanker Poll Inc.,* No. 14 Civ. 6412, 2015 WL 915294 (S.D.N.Y. 2015)... 1

*I.T. Consultants, Inc. v. Islamic Republic of Pakistan,* No. 00-cv-503 (WBB), 2000 U.S. Dist. Lexis 22548 (D.D.C. Sept. 28, 2000) ................................................................................... 21

*In re MF Global Holdings Ltd.,* 561 B.R. 608 (S.D.N.Y. 2016) .................................................. 19

*Interamerican Refining Corp. v. Texaco Maracaibo, Inc.,* 307 F.Supp. 1291 (D. Del. 1970) ..... 28

*Isaacs v. OCE Bus. Servs., Inc.,* 968 F. Supp.2d 564 (S.D.N.Y. 2013) ........................................ 14

*Mar. Ins. Co. v. Emery Air Freight Corp.,* 983 F.2d 437 (2d Cir. 1993) ............................... 11, 13

*Micula v. Gov't of Rom.,* No. 15 Misc. 107, 2015 WL 4643180 (S.D.N.Y. 2015) ..................... 28

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.,* 473 U.S. 614 (1985) ...................... 21

*N. Y. State Thruway Auth. v. Fenech,* 938 N.Y.S.2d 654 (1st Dep't 2012) .................................. 20

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA),* 508 F.2d 969 (2d Cir. 1974) ........................................................................... 22

*Republic of Ecuador v. Chevron Corp.,* 638 F.3d 384 (2d Cir. 2011) ..................................... 8, 26

*Rusoro Mining Ltd v. Bolivarian Republic of Venez.,* 300 F. Supp.3d 137 (D.D.C. 2018) .......... 23

*Seabury Const. Corp. v. Jeffrey Chain Corp.,* 289 F.3d 63 (2d Cir. 2002) .................................... 9

*See Blanco v. U.S.,* 775 F.2d 53 (2d Cir. 1985) ......................................................................... 17

*Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.,* 198 F.3d 88 (2d Cir. 1999) ............................................................................................................................. 9

*Stati v. Republic of Kazakhstan,* 199 F. Supp. 3d 179 (D.D.C. 2016) ..................................... 8, 11

*Stati v. Republic of Kazakhstan,* 302 F. Supp.3d 187 (D.D.C. 2018) ........................................... 7

*Telenor Mobile Commc'ns AS v. Storm LLC,* 524 F. Supp.2d 332 (S.D.N.Y. 2007) ................... 26

*Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243 (1984) .................................... 11

*U.S. Trust Co. of New York v. Jenner,* 168 F.3d 630 (2d Cir. 1999) ............................................ 10

*U.S. v. Ali,* 718 F.3d 929 (D.C. Cir. 2013) ................................................................................. 12

*United Paperworks v. Misco, Inc.,* 484 U.S. 29 (1987) ................................................................ 23

*Victoria Sales Corp. v. Emery Air Freight*, 917 F.2d 705 (2d Cir. 1990) .................................... 13

*Water Splash, Inc. v. Menon*, 137 S. Ct. 1504 (2017) ................................................................ 19

*Whitney v. Robertson*, 124 U.S. 190 (1888) ............................................................................. 17

*Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, No. 96 Civ. 5853, 1996 WL
    728646 (S.D.N.Y. 1996) ...................................................................................................... 1, 27

## Statutes

28 U.S.C. § 1330(a) ................................................................................................................. 7

28 U.S.C. §§ 1602, *et. seq* ...................................................................................................... 6

## Other Authorities

Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or
    Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163........................... 15, 16

Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95................................................... 1, 8, 10

European Commission, Treaties Office, "Inventory of Agreements Containing the Disconnection
    Clause,"
    http://ec.europa.eu/world/agreements/ClauseTreatiesPDFGeneratorAction.do?clauseID=31. 12

European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115
    (Jan. 6, 1995), Annex 1 ...................................................................................................... 19

European Union, "Regulations, Directives, and other acts," https://europa.eu/european-union/eu-
    law/legal-acts_en#directives ............................................................................................. 21

Hague Conference on Private International Law, "Declaration/Reservation/Notification:  Spain,"
    https://www.hcch.net/en/instruments/conventions/status-
    table/notifications/?csid=421&disp=resdn ........................................................................ 15

*Opinion pursuant to Article 218(11) TFEU*, CJEU Case EU:C:2019:341, Apr. 30, 2019............. 5

Restatement (Fourth) of Foreign Relations Law § 442 (2018).................................................... 22

*RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Spain*, ICSID Case No. ARB/13/30,
    Decision on Jurisdiction, June 6, 2016 ................................................................................ 12

*Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C-284/16, CJEU Case C-284/16, Preliminary Ruling, Mar. 6, 2018 ("*Achmea*") ............................................................. 3, 4, 5, 14

Treaty Establishing the European Atomic Energy Community, March 25, 1957, 298 U.N.T.S. 259.................................................................................................................................. 2

Treaty Establishing the European Coal and Steel Community, April 18, 1951, 261 U.N.T.S. 1402
Treaty Establishing the European Economic Community, March 25, 1957, 298 U.N.T.S. 3 ........ 2

Treaty on European Union, February 7, 1992, 31 I.L.M. 253 ....................................................... 2

U.S. Dept. of State, Frequently Asked Questions, *Vienna Convention on the Law of Treaties*, https://www.state.gov/s/l/treaty/faqs/70139.htm ....................................................... 9

United Nations Treaty Service, "Vienna Convention on the Law of Treaties," https://treaties.un.org/pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23&Temp=mtdsg3&clang=_en ............................................................... 9
Vienna Convention on the Law of Treaties, Apr. 24, 1970, 1155 U.N.T.S. 331 ......... 9, 10, 11, 19

## I.      PRELIMINARY STATEMENT

This is a simple, straightforward case.  The following facts are undisputed, and provide the

lens through which this Court must address this case:

- Respondent The Kingdom of Spain ("Spain") has ratified the Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95, Dec. of Amy Roebuck Frey ("Frey Dec."), Ex. B ("ECT"), a multilateral treaty between 54 European and non-European countries that protects foreign investors in the energy sector;

- The ECT provides for binding arbitration of claims involving alleged violations of its substantive protections; specifically, Article 26 of the ECT constitutes a standing offer by ECT member states to arbitrate disputes with ECT-eligible investors;

- Petitioners are "investors" within the meaning of the ECT, who properly invoked Article 26 in response to Spain's revocation of certain energy incentive programs on which Petitioners had relied;

- An arbitral tribunal, on full briefing and following a hearing that addressed all of the arbitration-related objections that Spain raises before this Court, held that Spain had violated the ECT, that Petitioners suffered damage as a result of those violations, and that Petitioners were entitled, under international law, to be compensated for that damage.

There is nothing unique or novel about this arbitration agreement:  It presents a classic, cut and

dry treaty-based arbitration agreement the likes of which U.S. courts, including the U.S. Supreme

Court, have enforced countless times.[1]

Spain, with the support of the European Commission, seeks to renege on this agreement by

claiming that it violates the law of the European Union ("EU").  Despite having made, through its

accession to the ECT, an offer to arbitrate ECT disputes, Spain now claims that it lacked the ability

---

[1] *See, e.g., BG Grp., PLC v. Republic of Arg.*, 572 U.S. 25 (2014) (confirming an arbitral award against Argentina); *Hess Corp. v. Dorado Tanker Poll Inc.*, No. 14 Civ. 6412, 2015 WL 915294 (S.D.N.Y. 2015) (confirming an arbitral award under the New York Convention and the FAA after rejecting respondent's arguments that the panel applied the wrong law); *Yusuf Ahmed Alghanim & Sons, W.L.L. v. Toys "R" Us, Inc.*, No. 96 Civ. 5853, 1996 WL 728646 (S.D.N.Y. 1996) (confirming the award after rejecting respondent's arguments concerning, for example, improperly awarded damages), *aff'd*, 126 F.3d (15) (2d Cir. 1997); *Crescendo Mar. Co. v. Bank of Communs. Co.*, No. 15 Civ. 4481 (JFK), 2016 WL 750351 (S.D.N.Y. Feb. 22, 2016) (confirming three arbitral awards against a Chinese bank); *Deiulemar Compagnia Di Navigaziona S.p.A v. Transocean Coal Co.*, No. 03 Civ. 2038 (RCC), 2004 U.S. Dist. LEXIS 23948 (S.D.N.Y. Nov. 30, 2004) (rejecting respondents argument that the award should not be enforced due to the damages awarded, instead confirming the award).

to make that offer with investors from other European Union states.  In an argument that calls to mind the Second Circuit's recent decision in *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92 (2d Cir. 2016) *("Pemex")*, Spain claims that this inability is rooted in a judicial decision, rendered 24 years **after** the ECT entered into force, that it claims retroactively nullified its consent to arbitration by finding that the Treaty on European Union[2] and the Treaty on the Functioning of the European Union (collectively, the "EU Treaties") preclude any institution other than the Court of Justice of the European Union ("CJEU") from ruling on issues of EU law, which Spain claims to be "a part of" international law. Spain also asserts that the arbitration award at issue here may not be recognized and enforced in the United States because the European Commission ("EC") — the executive organ of the EU — has decided that the damages provided by the arbitration award constitute "state aid," over which the EC claims exclusive authority to regulate.

Spain's arguments find no footing in U.S. law; the Court must reject them.  There is no question that Spain offered, through its accession to the ECT, to arbitrate disputes with ECT investors, and that Petitioners accepted that offer.  Those undisputed facts amount to an enforceable arbitration agreement as a matter of fact and law, and Spain's efforts to retroactively escape that agreement by citing a 2018 decision of a European court that concerned **different parties** and a **completely different type of treaty** applying a **different body of law** do nothing to affect the validity of the agreement.  Spain's arguments concerning service of process, "state aid,"

---

[2] Several treaties form the basis for what later became the Treaty on European Union ("TEU"), February 7, 1992,  31 I.L.M. 253: *see, e.g.*, Treaty Establishing the European Coal and Steel Community, April 18, 1951, 261 U.N.T.S. 140; Treaty Establishing the European Economic Community, March 25, 1957, 298 U.N.T.S. 3; Treaty Establishing the European Atomic Energy Community, March 25, 1957, 298 U.N.T.S. 259.

public policy, and the foreign compulsion doctrine fare no better, as each misapprehends the legal principle upon which it purports to rely.  The Award should be confirmed forthwith.

## II.    Factual Background[3]

### A.    Post-Award Proceedings

On February 14, 2019, two months after Petitioners commenced this case, Spain initiated proceedings before the Svea Court of Appeal ("Svea Court") in Sweden, seeking to vacate the Award.  Spain simultaneously requested an order suspending enforcement of the Award. Declaration of Jakob Ragnwaldh ("Ragnwaldh Dec.") ¶ 6.  On February 21, 2019, the Svea Court issued an *ex parte* order (the "Order") suspending execution of the award "until further notice." Ragnwaldh Dec., ¶ 6, Ex. B.  Notably, at the time the Order was issued, Petitioners had not appeared before or been heard by the Svea Court; they still have not.  Ragnwaldh Dec., ¶ 8; Frey Dec., ¶ 48.  Spain also requested that the Svea Court refer questions regarding the applicability of EU law to the CJEU; that request remains pending.  *See* Ragnwaldh Dec., ¶ 12.[4]

### B.    *Achmea*

The crux of Spain's objection to recognition of the Award focuses on the purported effect of a recent decision of the CJEU concerning a dispute between a Dutch party (Achmea B.V.) and Slovakia.  *See Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C-284/16, CJEU Case C-284/16, Preliminary Ruling, Mar. 6, 2018 ("*Achmea*"), Frey Dec., Ex. D.

*Achmea* involved a dispute over Slovakia's violations of a bilateral investment treaty ("BIT") between the Netherlands and Slovakia.  *Id*. at ¶¶ 6-9.  After the Dutch investors received an arbitral award in their favor, Slovakia initiated set-aside proceedings in Germany, arguing that

---

[3] In the interest of brevity, Petitioners respectfully refer the Court to the Petition and supporting papers for the full factual background, and limit the recitation here to those facts that are not already of record and that are critical to this Reply.

[4] Notably, the Svea Court recently refused another party's request to submit the same question to the CJEU.  *See* Ragnwaldh Dec., ¶ 12–13.

the tribunal lacked jurisdiction to hear the dispute, as the arbitration clause contained in the BIT was incompatible with EU law.  *Id.* at ¶ 12.  The Higher Regional Court of Frankfurt summarily rejected these arguments.  On appeal, the German Federal Court of Justice referred several questions to the CJEU, including whether "similar" intra-EU dispute resolution clauses comported with EU law.  *Id.* at ¶ 14.

The CJEU ruled on March 6, 2018.  The decision addressed whether a "provision in a **bilateral** investment protection agreement between Member States of the European Union" is incompatible with EU law.  *Id.* at ¶ 23 (emphasis supplied).  The CJEU found that the arbitration clause contained in the BIT was not compatible with EU law, as it impacted the mechanism of judicial review of EU law provided by the EU legal framework, which requires that the CJEU be capable of reviewing issues of EU law.  *Id.* at ¶¶ 58, 60.  The CJEU focused on the choice of law clause contained in the BIT, which required the *Achmea* tribunal to apply EU law.  *Id.* at ¶¶ 39–42.  Finding that awards obtained from intra-EU BITs did not provide any method by which to refer questions concerning EU law to it, the CJEU found that the arbitration mechanism under the BIT would not "ensur[e] the full effectiveness of EU law, even though they might concern the interpretation or application of that law."  *Id.* at ¶¶ 53–56.

Notably, the CJEU made clear that its ruling applied **only** to BITs concluded between EU states.  Specifically, the CJEU confirmed that an investor-state arbitration mechanism is not automatically incompatible with EU law, and distinguished the BIT it was examining from other international agreements, including, critically here, agreements entered into by the EU.  The CJEU noted that an "international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the [CJEU], **is not in principle incompatible with EU law**."  *Id.* at ¶ 57 (emphasis supplied).  It

further noted the "competence of the EU in the field of international relations" in addition to its "capacity to conclude international agreements" which thus "necessarily entail[s] the power to submit to the decisions of a court which is created or designated by such agreements." *Id.* at ¶ 57.

By its own terms then, the CJEU's decision in *Achmea* applies **only** to intra-EU BITs. Despite Spain's assertions, nowhere in the decision is there any sweeping holding that would have the effect of invalidating arbitration clauses in **multilateral** treaties like the ECT that (a) the EU has itself ratified, (b) have non-EU signatories, and (c) are governed by international, as opposed to EU, law. Instead, the CJEU was concerned with "an agreement which was concluded not by the EU but by Member States," a material difference from the ECT, which was negotiated and entered into by the EU itself. *Id.* at ¶ 58.

Since *Achmea*, arbitral tribunals hearing ECT disputes have unanimously rejected the argument, made repeatedly by EU member states, that *Achmea* invalidates ECT arbitration agreements entered into between EU member states and EU investors. *See* Frey Dec. ¶ 24. Were this not enough, on April 30, 2019, the CJEU clarified that investor state dispute settlement mechanisms that bypass the CJEU do not "adversely affect[] the autonomy of the EU legal order," and held that such arrangements — particularly when the EU is included as a Contracting Party — are compatible with EU law. *See Opinion pursuant to Article 218(11) TFEU*, CJEU Case EU:C:2019:341, Apr. 30, 2019, ¶¶ 13–16, Frey Dec., Ex. E (hereinafter "CETA Decision").

## III. ARGUMENT

### A.  Spain's Objections to this Court's Jurisdiction are Meritless

#### 1.  This Court Has Subject Matter Jurisdiction Because Spain Agreed in the ECT to Arbitrate this Dispute and the New York Convention Applies to that Agreement

The parties agree that the Foreign Sovereign Immunities Act, 28 U.S.C. §§ 1602, *et. seq.* ("FSIA"), provides the sole basis for this court's jurisdiction. While the FSIA provides foreign

states with presumptive immunity from suit before U.S. courts, where a case falls within one of the FSIA's enumerated exceptions from immunity, a U.S. court automatically has subject matter jurisdiction. *See* 28 U.S.C. § 1330(a). Likewise, where a court has subject matter jurisdiction and service of process is duly made in accordance with 28 U.S.C. § 1608(a), personal jurisdiction exists. *Id*. § 1330(b). Each of these prerequisites to jurisdiction is satisfied.

Spain's presumptive immunity in this case is abrogated by Section 1605(a)(6) of the FSIA, which provides that a foreign state does not enjoy immunity in any case brought "to confirm arbitration awards that are or may be governed by a treaty or other international agreement in force in the United States calling for the recognition and enforcement of arbitral awards." It is beyond dispute that Spain made an agreement to arbitrate this case with Petitioners; as demonstrated below, that agreement, notwithstanding Spain's contention that the agreement is "invalid" under EU law, establishes the arbitration exception to immunity and this Court's jurisdiction.

### a)      The Tribunal's Finding that the Parties Agreed to Arbitrate is Entitled to Deference

As an initial matter, this Court is obligated to show deference to the tribunal's decision regarding the existence and validity of the agreement to arbitrate. *See, e.g., Stati v. Republic of Kazakhstan*, 302 F. Supp.3d 187, 204 (D.D.C. 2018) (court's review of ECT arbitration agreement and award rendered under SCC Rules should be "extremely limited") (citation omitted)), *aff'd*, No. 18-7047 (D.C. Cir. 2019).

### b)      Spain Made a Binding Offer to Arbitrate this Dispute, and Petitioners Accepted that Offer

Even if this Court reviews the agreement to arbitrate *de novo*, there was clearly an agreement to arbitrate. Spain does not dispute this fact, but argues that the CJEU's ruling in *Achmea* voids or invalidates that agreement retroactively. *See* Response to Pet. to Confirm Arb. Award ("Resp."), at 1–2. This argument lacks merit.

6

**First**, Petitioners have demonstrated that Spain agreed to arbitrate this matter: It is undisputed that Spain is a signatory of the ECT, that the ECT contains an arbitration provision, and that Petitioners duly invoked that provision. *See, e.g.*, *Stati v. Republic of Kazakhstan*, 199 F. Supp.3d 179, 188 (D.D.C. 2016) (proffer of treaty containing arbitration provision, coupled with notice of arbitration, establishes prima facie evidence of arbitration agreement) (citing *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 (D.C. Cir. 2015), *aff'd*, No. 18-7047 (D.C. Cir. 2019) (unpublished)); *Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) ("[a]ll that is necessary to form an agreement to arbitrate is for one party to be a . . . signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms."). Courts have held that, for purposes of determining the applicability of the FSIA's arbitration exception, the showing required to establish the agreement is a minimal one, and Spain is required to overcome a "heavy burden" to demonstrate that no agreement was made. *Aguidas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) ("For purely factual matters under the FSIA, however, this is only a burden of production; the burden of persuasion rests with the foreign sovereign claiming immunity, which must establish the absence of the factual basis by a preponderance of the evidence."); *Cargill Int'l v. M/T Pavel Dybenko,* 991 F.2d 1012, 1016 (2d Cir. 1993) ("[T]he ultimate burden of persuasion remains with the alleged foreign sovereign"). Spain has not met, and cannot meet, this burden.

### c) Spain's Argument Ignores the Plain Language of the ECT

The Supreme Court has held that where the existence of an agreement to arbitrate has been questioned, U.S. courts are to apply U.S. law. *First Options of Chicago, Inc. v. Kaplan,* 514 U.S. 938, 944 (1995) (finding that determining "whether the parties agreed to arbitrate a certain matter . . . courts generally . . . should apply ordinary state-law principles that govern the formation of contracts."); *Smith/Enron Cogeneration Ltd. P'ship, Inc. v. Smith Cogeneration Int'l, Inc.*, 198

F.3d 88, 96 (2d Cir. 1999) (finding that federal common law applied to a case arising under Chapter 2 of the Federal Arbitration Act ("FAA"), which also incorporates the New York Convention).[5] Under these principles, the plain language of the ECT serves as the primary — and, in the absence of any ambiguity, the **exclusive** — interpretive tool.  *See, e.g., Seabury Const. Corp. v. Jeffrey Chain Corp.*, 289 F.3d 63, 68 (2d Cir. 2002) ("Where the contract is unambiguous, courts must effectuate its plain language."); *U.S. Trust Co. of New York v. Jenner*, 168 F.3d 630, 632 (2d Cir. 1999) ("[C]ourts are required to give effect to the contract as written and may not consider extrinsic evidence to alter or interpret its meaning."); *Alpha Capital Anstalt v. Real Goods Solar, Inc.*, 311 F. Supp.3d 623, 628 (S.D.N.Y. 2018) ("When an agreement is clear and unambiguous on its face then that agreement must be enforced according to the plain meaning of its terms.").

Spain does not claim that Article 26 of the ECT is ambiguous, meaning that the Court must construe the provision as it is written.  Resp., at 18-19.  The plain language of Article 26(3)(a) provides that "[s]ubject only to subparagraphs (b) and (c), each Contracting Party hereby gives its **unconditional consent** to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." ECT Art. 26(3)(a), Frey Dec., Ex. B (emphasis supplied).[6]  Article 26 thus contains clear and unambiguous language that an agreement to arbitrate has been formed when "an Investor chooses to submit the dispute for resolution . . . in writing" and that this consent "shall be considered to satisfy the requirement for . . . an 'agreement in writing' for purposes of Article II of the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards [*i.e.*, the New York Convention]."  ECT Art. 26(3)(a),

---

[5] One court in this District has found that "[w]hen it comes to general rules of contract interpretation, there is little difference between federal common law and New York law . . . and, in developing federal common law, the federal courts may look to state law [.]" *Barnes v. Am. Int'l Life Assur. Co.*, 681 F. Supp. 2d 513, 520 (S.D.N.Y. 2010).

[6] Neither of these exceptions are applicable as subparagraph (b) concerns resubmission of the same dispute and Spain is not one of the member States to which subparagraph (c) applies.

Frey Dec., Ex. B.  That language, which neither mentions nor gives the reader **any** indication that it does not apply to disputes between EU-based investors and EU Member States that have signed the treaty — establishes an unequivocal offer to arbitrate that is not subject to any exceptions or reservations.  *See Stati*, 199 F. Supp. 3d at 188–89 (holding that Article 26 of ECT constituted standing offer to arbitrate).  That is all that is required to demonstrate the existence of an agreement to arbitrate.

Resort to principles of treaty interpretation, under either U.S. or international law, yields the same result.  The Supreme Court has held that because "a treaty is a contract," the same general rules apply when interpreting a treaty as would when interpreting a contract.  *See, e.g., Trans World Airlines, Inc. v. Franklin Mint Corp.*, 466 U.S. 243, 262 (1984) ("A treaty is essentially a contract between or among sovereign nations [and] [g]eneral rules of construction apply to international agreements.") (citations omitted); *Mar. Ins. Co. v. Emery Air Freight Corp.*, 983 F.2d 437, 440 (2d Cir. 1993) ("Both precedent and reason counsel that courts refrain from altering even slightly the plain, unambiguous language of a treaty negotiated among diverse sovereign nations."); *Chan v. Korean Air Lines*, 490 U.S. 122, 135 (1989) ("[W]here the text is clear . . . we have no power to insert an amendment.").

International principles of treaty interpretation are in accord.  Article 31 of the Vienna Convention on the Law of Treaties ("VCLT") is the primary rule of treaty interpretation under international law.[7]  Like U.S. caselaw, the VCLT provides that "a treaty shall be interpreted in

---

[7] The U.S. signed the VCLT.  *See* Vienna Convention on the Law of Treaties, Apr. 24, 1970, 1155 U.N.T.S. 331. However, the U.S. has not ratified it. United Nations Treaty Service, "Vienna Convention on the Law of Treaties," https://treaties.un.org/pages/ViewDetailsIII.aspx?src=TREATY&mtdsg_no=XXIII-1&chapter=23&Temp=mtdsg3 &clang=_en (last visited May 1, 2019).  Despite its unratified status, both the District of Columbia Circuit and the U.S. Department of State have noted that the VCLT constitutes an authoritative guide to treaty interpretation. *U.S. v. Ali*, 718 F.3d 929, 939 (D.C. Cir. 2013) (Vienna Convention establishes "[b]asic principles of treaty interpretation"); U.S. Dept. of State, Frequently Asked Questions, *Vienna Convention on the Law of Treaties*, https://www.state.gov/s/l/treaty/faqs/70139.htm (last visited May 1, 2019).

good faith in accordance with the ordinary meaning to be given to the terms of the treaty in their context and in the light of its object and purpose." *See* VCLT Art. 31.

Application of these interpretive rules to the ECT and the record of this case compels the conclusion that Spain agreed to arbitrate this dispute with Petitioners. As noted above, Article 26 of the ECT applies to "[d]isputes between a Contracting Party and an Investor of another Contracting party relating to an Investment of the latter in the Area of the former," ECT, Art 26(1), and provides that "each Contracting party . . . gives its **unconditional consent** to the submission of a dispute to international arbitration or conciliation in accordance with the provisions of this Article." ECT, Art. 26(3)(a) (emphasis supplied), Frey Dec., Ex. B. Spain does not contest that the first criteria is satisfied. Instead, it urges the Court to find, on the basis of the 2018 *Achmea* decision, that Article 26 contains an implicit restriction that bars arbitration between EU-based investors and EU Member States. Resp., at 16. No such restriction appears in the text of Article 26, and this Court is not free to superimpose one at Spain's behest. *Mar. Ins. Co. v. Emery Air Freight Corp.,* 983 F.2d at 440 ("Even if a judicial interpretation is 'sensible,' 'to engraft such an interpretation onto the plain language of [a treaty article] would require an impermissible judicial amendment of the [treaty].") (quoting *Victoria Sales Corp. v. Emery Air Freight*, 917 F.2d 705, 707 (2d Cir. 1990)). Further, Article 26 makes clear that any tribunal constituted thereunder shall resolve disputes applying **international law**, not EU law (ECT Art. 26(6), Frey Dec., Ex. B (noting that a tribunal "shall decide the issues in accordance with this Treaty and the applicable rules and principles of international law")); because *Achmea* concerned the purported need for the CJEU to be able to review questions of EU law, it would not apply to disputes resolved under Article 26.

> **d)      The EU's Accession to the ECT Undermines Spain's Argument**

Even if the Court were to look past the plain language of Article 26 of the ECT — and it should not, for the reasons set forth above — Spain's argument fails. The key extrinsic factor in

this case is the fact that the EU itself ratified the ECT.  And whether looked at through the lens of U.S. or international law, the EU's ratification of the ECT (and its investor-state arbitration mechanism) fatally undermines Spain's position, for several reasons.  **First**, it must be presumed that, at the time they ratified the ECT, the EU and its Member States had the same understanding they claim to have now concerning (a) the potential applicability of EU law in disputes arising under Article 26, and (b) the requirement, under the EU Treaties, that the CJEU have the ability in any dispute to address questions of EU law.  *See, e.g., Isaacs v. OCE Bus. Servs., Inc.*, 968 F. Supp.2d 564, 569 (S.D.N.Y. 2013) ("[A] person 'who signs or accepts a written contract is conclusively presumed to know its contents and assent to them.'") (quoting *Gold v. Deutsche Aktiengesellschaft,* 365 F.3d 144, 149 (2d Cir. 2004)).  As such, the EU's ratification of the ECT, including its dispute resolution mechanism, must be viewed as an agreement by the EU to permit any claims under the treaty to be resolved conclusively through arbitration.  This conclusion is reinforced by the fact that neither the EU nor any of its Member States provided in the ECT that its agreement to arbitrate was made subject to the EU Treaties.[8]  *See* VCLT, art. 30(2)-(3).

Second, Article 16 of the ECT makes clear that its investor protection and dispute resolution mechanisms were to be enforceable notwithstanding the applicability of any other treaty.  Article 16 provides:

> Where two or more Contracting Parties have entered into a prior international agreement, or enter into a subsequent international agreement, whose terms in either case concern the subject matter of Part III or V of this Treaty, (1) nothing in Part III or V of this Treaty shall be construed to derogate from any provision of such terms of the other agreement or from any right to dispute resolution with respect thereto under that agreement; and **(2) nothing in such terms of the other agreement shall be construed to derogate from any**

---

[8] Critically, Article 26 of the ECT was expressly made subject to a different prior treaty, known as the Svalbard Treaty. That the negotiating parties, including the EU, made the ECT (and its dispute resolution specifically) subject to one treaty, but **not** to the EU Treaties, is highly relevant and forcefully undermines Spain's argument that "intra-EU" disputes were not intended to be subject to Article 26.  *See* VCLT, art. 30(2).

> **provision of Part III or V of this Treaty or from any right to dispute resolution with respect thereto under this Treaty, where any such provision is more favourable to the Investor or Investment.**

ECT, Art. 16, Frey Dec., Ex. B (emphasis supplied).  Article 26 of the ECT is contained in Part V, and Petitioners respectfully submit that Spain's argument — that an investor from an EU state is not entitled, despite the ECT's plain terms, to submit a dispute with another EU state to arbitration – is impossible to reconcile with Article 16, since Spain's argument would, by its core terms, deny EU-based investors the right to avail themselves of the arbitration process provided by the ECT.

**Finally**, Petitioners note that the lack of a "disconnection clause" — a treaty concept used to carve certain subject matters or parties out of a treaty's application — in the ECT further undermines Spain's argument.  The EU has included disconnection clauses in other treaties,[9] and as noted above, the contracting parties to the ECT specifically provided that the ECT would not affect the previously-ratified Svalbard Treaty.  The failure to include a disconnection clause preserving the CJEU's ability to rule on questions of EU law, therefore, is a notable and material omission from the ECT that undermines Spain's argument.  As the tribunal in another ECT dispute observed:

> If one or more parties to a treaty wish to exclude the application of that treaty in certain respect or circumstances, they must either make a reservation (excluded in the present case by Article 46 of the ECT) or include an unequivocal disconnection clause in the treaty itself. The attempt to construe an implicit clause into Article 26 of the ECT is untenable.

*RREEF Infrastructure (G.P.) Ltd. et al. v. Kingdom of Spain*, ICSID Case No. ARB/13/30, Decision on Jurisdiction, June 6, 2016, ¶¶ 84-85, Frey Dec., Ex. I.

---

[9] *See* European Commission, Treaties Office, "Inventory of Agreements Containing the Disconnection Clause," http://ec.europa.eu/world/agreements/ClauseTreatiesPDFGeneratorAction.do?clauseID=31 (last visited April 29, 2019).

### e)   *Achmea* **Does Not Render Spain's Agreement to Arbitrate Unlawful or Invalid**

Spain made an agreement to arbitrate by agreeing to the ECT.  Spain now claims that that agreement was not valid and places heavy reliance on the CJEU's *Achmea* ruling in support of that argument.  Spain has, however, vastly overstated the CJEU's holding in *Achmea*.

Spain contends that *Achmea*, "by its terms, applies to 'any international agreement concluded between Member States,' **including the ECT**."  Resp., at 11 (emphasis supplied).  Spain added the last clause, however — *Achmea* **never mentions** the ECT.  This should come as no surprise, since *Achmea* did not arise under the ECT, or even a treaty of the same type.  Rather, as noted above, *Achmea* arose out of a BIT concluded between two EU Member States.  That BIT called for disputes to be resolved using several sources of law, including, critically, national law ("the law in force of the Contracting Party concerned.").  *Achmea*, Frey Dec., Ex. D, ¶ 6.  The BIT at issue in *Achmea* was, therefore, a **completely different type of treaty** applying only to EU parties and **applying a different body of law** than the ECT.  That is not the case with the ECT, the signatories to which include non-EU states and, critically, the EU itself, and which applies international — not national — law to disputes.

It is the EU's membership in the ECT that materially distinguishes that treaty from the one at issue in *Achmea*.  Spain goes to great length to note that EU law, like U.S. federal law, takes precedence over the law of its Member States.  Resp., at 19; Hinderling Dec. ¶ 16.  It thus stands to reason that those Member States would lack competence to make treaties with each other that violated EU law, just as U.S. states would be prohibited from entering into an interstate compact or agreement that violated U.S. federal law.  As the CJEU itself noted in *Achmea*, however, the legal landscape changes radically when the **EU itself** ratifies a treaty, since it — as the federal body — has the competence to enter into international agreements that provide for disputes to be

submitted to tribunals other than the CJEU, regardless of their effect on EU law.  *See Blanco v.*

*U.S.,* 775 F.2d 53, 61 (2d Cir. 1985) (noting that if the terms of a treaty are clearly at odds with a

prior-enacted statute, it will prevail as the "last in date will control the other") (quoting *Whitney v.*

*Robertson*, 124 U.S. 190, 194 (1888)).  Specifically, the CJEU in *Achmea* stated:

> It is true that, according to settled case-law of the Court, an international agreement providing for the establishment of a court responsible for the interpretation of its provisions and whose decisions are binding on the institutions, including the [CJEU], is not in principle incompatible with EU law. **The competence of the EU in the field of international relations and its capacity to conclude international agreements necessarily entail the power to submit to the decisions of a court which is created or designated by such agreements as regards the interpretation and application of their provisions, provided that the autonomy of the EU and its legal order is respected…**

> In the present case, however, apart from the fact that the disputes falling within the jurisdiction of the arbitral tribunal referred to in Article 8 of the BIT may relate to the interpretation both of that agreement and of EU law, the possibility of submitting those disputes to a body which is not part of the judicial system of the EU is provided for by **an agreement which was concluded not by the EU but by Member States**.

*Achmea*, ¶¶ 57-58, Frey Dec., Ex. D (emphasis supplied).  This language from *Achmea* makes

clear that it applies exclusively to agreements concluded by member states, and not to agreements,

like the ECT, to which the EU is a party.  *Achmea* thus cannot be viewed as having "invalidated"

the arbitration agreement in this case.  Petitioners are not alone in reaching this conclusion:  Every

arbitral tribunal to consider the "intra-EU" issue under Article 26 of the ECT — **twenty-eight**

**tribunals to date** — has reached the same conclusion.  *See* Frey Dec., ¶ 24.[10]

---

[10] Finally, even if the Court was to conclude that the CJEU's decision in *Achmea* could be applied to the ECT — and, for the foregoing reasons, it cannot and should not — doing so would constitute a retroactive application of that decision in a fashion that the Second Circuit has found improper.  *See Pemex*, 832 F.3d at 92.  In *Pemex*, the Second Circuit refused to recognize a Mexican judgment vacating an arbitral award based on a Mexican statute that was enacted after the parties had entered into an arbitration agreement.  While *Pemex* did not involve a treaty-based

The Court should find that the arbitration agreement at issue was validly formed and is enforceable, and that the Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1605(a)(6) and 1330(a).

### B.    Petitioners Served the Petition in Accordance with the Hague Convention

Petitioners properly served the Petition and supporting papers under Section 1608(a)(2) in accordance with the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters, Nov. 15, 1965, 20 U.S.T. 361, 658 U.N.T.S. 163 (the "Hague Convention"), to which Spain is a signatory.

Spain allows service under Article 10 of the Hague Convention, which provides that "the present Convention shall not interfere with (a) the freedom to send judicial documents, by postal channels, **directly to persons abroad.**" (emphasis supplied)  While the Hague Convention permits signatory states to opt out of Article 10, Spain has not done so, and allows persons in its territory to be served directly and via mail.[11]  Petitioners accordingly served the Attorney General of Spain, the person who received service of the notices of arbitration,[12] by mail and by overnight courier. *See* Declaration of Erin Collins, Ex. A.  This constitutes proper service.  *See e.g.*, *Water Splash, Inc. v. Menon*, 137 S. Ct. 1504, 1513 (2017) (finding that "the traditional tools of treaty

---

arbitration agreement, the thrust of its ruling was clear, and would apply equally here:  U.S. courts will not recognize foreign judgments that have the effect of retroactively invalidating arbitration agreements that an investor relied upon when considering whether to invest in that state.  *See Pemex*, 832 F.3d at 108–11.  The ECT entered into force in 1994, and Petitioners submit that, at least as a matter of equity and public policy as recognized by the Second Circuit in *Pemex*, any application of the 2018 decision in *Achmea* to invalidate arbitrations commenced in good faith reliance on Article 26 of the ECT would run far afoul of U.S. public policy and justify both a refusal to afford comity to *Achmea* and, to the extent that decision is relied upon by the Swedish courts to invalidate the Award, to recognize the Award in the United States notwithstanding its suspension or vacatur.

[11] While Spain has submitted declarations regarding the interpretation of other provisions of the Hague Convention, notably absent is any reservation or declaration regarding Article 10.  *See* Hague Conference on Private International Law, "Declaration/Reservation/Notification: Spain," https://www.hcch.net/en/instruments/conventions/status-table/notifications/?csid=421&disp=resdn (last visited May 1, 2019).

[12] Specifically, the Stockholm Chamber of Commerce contacted the Abogacía General del Estado in response to Petitioners' commencement of arbitration.

interpretation unmistakably demonstrate that Article 10(a) encompasses service by mail"); *In re MF Global Holdings Ltd*., 561 B.R. 608, 619 (S.D.N.Y. 2016) (finding service of Bermuda insurers through overnight mail courier complied with Article 10(a) of the Hague Convention because the U.K. had not objected to Article 10(a) of the Hague Convention); *N. Y. State Thruway Auth. v. Fenech*, 938 N.Y.S.2d 654, 655 (1st Dep't 2012) (finding service by overnight mail "directly to persons abroad" proper under Article 10(a)).

Spain's argument that service was required to be made "on" the Central Authority misapprehends the role played by the Central Authority under the Convention.  The Central Authority is the entity in a country designated to receive and complete service on the person to be served – not designated recipient of service on the State.  Article 2 provides that "the Central Authority . . . will undertake to receive requests for service coming from other Contract States and to proceed in conformity with the provisions of Articles 3 to 6 [*i.e.*, to complete service on the defendant]." *See* Hague Convention, Art. 2.

However, because Article 10 permits service to be made "directly to persons abroad," it necessarily bypasses the Central Authority.  *See* Hague Convention, Art. 10; *see also Water Splash*, 137 S. Ct. at 1508 ("Submitting a request to a central authority is not, however the only method of service approved by the Convention"); *N. Y. State Thruway Auth.*, 938 N.Y.S.2d at 655 ("[n]othing in the Hague Convention, however, requires litigants to rely upon the central authority and a signatory may consent to [additional] methods of service within its boundaries" and finding service by mail under Article 10(a) one such method).  There is, to sum, nothing in the Hague Convention to suggest that the Central Authority is the agent for service on Spain.

Spain cites *I.T. Consultants, Inc. v. Islamic Republic of Pakistan,* No. 00-cv-503 (WBB), 2000 U.S. Dist. Lexis 22548 (D.D.C. Sept. 28, 2000) in support of its argument.  Petitioners

respectfully submit that this decision, which was unpublished and does not bind this Court, is incorrect.  The court in that case appears to have assumed, based on the language of Pakistan's appointment of its Central Authority, that service on the state was required to be made **on** the Central Authority.  *I.T. Consultants*, however, failed to take note of the fact that Article 10 service does not involve the Central Authority, and to that extent, the court's analysis was erroneous (and, even if correct when rendered, has nonetheless been abrogated by *Water Splash*).

### C.     Respondent Fails to Meet its Burden in Showing any of the Article V Defenses Under the New York Convention Apply

Spain argues that the Award cannot be recognized based on the following Article V defenses to the New York Convention: (1) lack of an arbitration agreement pursuant to Article V(1)(a); (2) the Award "goes beyond the scope" of the agreement pursuant to Article V(1)(b); (3) the award would be contrary to public policy under Article V(2)(b); and (4) the award has been "suspended" and thus should not be recognized in accordance with Article V(1)(e).

District courts are granted little discretion in refusing to enforce arbitral awards due to the "emphatic federal policy in favor of arbitral dispute resolution."  *Arshad v. Trans. Sys, Inc.*, 183 F.Supp.3d 442, 446 (S.D.N.Y. 2016) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).  As the party objecting to enforcement, Spain accordingly bears a heavy burden in establishing any of these defenses.  *See Encyclopaedia Universalis S.A. v. Encyclopaedia Britannica, Inc.*, 403 F.3d 85, 91 (2d Cir. 2005) ("The party opposing enforcement of an arbitral award has the burden to prove that one of the seven defenses under the New York Convention applies . . . [and] [t]he burden is a heavy one, as 'the showing required to avoid summary confirmance is high.'") (citations omitted).  Spain fails to meet its heavy burden with regard to all of its invoked defenses under Article V.

### 1.     Spain Agreed to Arbitrate with Petitioners

Spain's argument that non-recognition is warranted under Article V(1)(a) of the Convention is meritless. Petitioners respectfully refer the Court to Part III.A.1, *supra*.

**2.    The Tribunal Did Not Rule on Anything "Outside the Submission to Arbitration"**

Spain argues next that confirmation of the Award should be denied under Article V(1)(c), which provides that a court may decline recognition if the award "deals with a difference not contemplated by or not falling within the terms of the submission to arbitration, or it contains decisions on matters beyond the scope of the submission to arbitration." In Spain's view, the Award granted relief "beyond the scope of the arbitration agreement" because the tribunal awarded damages that, in its view, constitute "state aid," purportedly in violation of EU law. Resp., at 22–23. This argument amounts to little more than *post hoc* labeling; it should be rejected.

Federal courts, in a line of cases tracing back to *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d 969 (2d Cir. 1974), have routinely and forcefully rejected arguments that arbitrators "exceeded their powers" by virtue of the damages they awarded. *See, e.g.*, *United Paperworks v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (noting that the "arbitrator will determine remedies for contract violations that he finds, courts have no authority to disagree with his honest judgment in that respect."); *Rusoro Mining Ltd v. Bolivarian Republic of Venez.*, 300 F. Supp.3d 137, 149 (D.D.C. 2018) (finding respondent's objections to the award pertained only to the damages analysis, and "courts have no authority to disagree with [the arbitrator's] honest judgment in that respect"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 244 F.Supp. 3d 100, 119 (D.D.C. 2017) (noting that the panel's damages calculation did not exceed the scope of the tribunal's authority, applying a deferential standard of review).

Spain fails to show that the tribunal ruled on any issues "outside the scope" of the agreement. A careful review of the Award demonstrates that the tribunal considered Petitioners

18

claims under rules of international law (Award, Ragnwaldh Dec., Ex. A ¶¶ 198–222, 264), found that Spain had violated the ECT (*Id.*, ¶ 432), and awarded damages according to well-established rules designed to compensate Petitioners for the losses they suffered as a result of Spain's treaty breaches (*Id.*, ¶¶ 432–38).   In a nutshell, Spain cannot escape liability resulting from a duly-convened arbitration simply by labeling the Award "state aid" and claiming that the tribunal lacks authority to "regulate" state aid.  Resp., at 22–23.  Doing so would effectively enable the EC — which Spain claims is the only body competent to regulate state aid — a veto power over **any** arbitration award rendered against an EU investor, a result that would make a mockery of each EU party's agreement to arbitrate and, by extension, constitute a flagrant breach of the New York Convention.  Spain's attempt to claim that the Award may not be enforced because it constitutes "state aid" is further belied by the ECT's legislative history, during which the drafters, likely anticipating a situation much like the one presented here, noted their view that member parties could not invoke provisions of their internal law to refuse performance under the ECT.  *See* European Energy Charter Conference Secretariat, Note from the Secretariat, 42/94, CONF 115 (Jan. 6, 1995), Annex 1 "Note of Chairman", Frey Dec., Ex. R (recalling the EEC's request to include an explanatory note that no ECT "party may not invoke the provisions of its internal law as justification for its failure to perform."); *see also* VCLT, Art. 27 (noting that a party to a treaty may not invoke its internal law to avoid performing its treaty obligations).  Spain's arguments to this Court turn these principles on their head, and they should be rejected.

### 3.    The Award Does Not Violate U.S. Public Policy

Spain asserts that recognition of the Award would violate "fundamental notions" of U.S. public policy because (a) recognition might force Spain to "violate EU law," and (b) recognition would be "contrary to the respect" owed by the U.S. to Europe.  Resp., at 24.  Neither of these arguments has any basis, and the Court should reject both.  Indeed, Petitioners submit that any

**refusal** to recognize the Award would undermine both U.S. public policy and constitute a departure from New York Convention norms.

Courts have held repeatedly that the public policy defense to recognition "should be construed narrowly" and that recognition of an award be denied on this ground may only where enforcement "would violate the forum state's most basic notions of morality and justice." *E.g., Europcar Italia, S.p.A. v. Maeillano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (citations omitted). As the Second Circuit noted in *Parsons,* "[t]o treat the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility," as it was "not meant to enshrine vagaries of international politics under the rubric of 'public policy'." *Parsons*, 508 F.2d at 974. Petitioners respectfully submit that Spain's argument goes to the heart of *Parsons*' admonition, as it would allow the EU and its Member States to ignore the international law obligations they have respectively undertaken in the ECT in favor of domestic prerogatives concerning their courts and "state aid" programs.

In fact, United States public policy clearly favors recognition of the Award. *See, e.g., Compagnie Noga D'Importation et D'Exportation, S.A. v. The Russian Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004) (noting that the high burden of proving a defense is "imposed because 'the public policy in favor of international arbitration is strong.'") (citations omitted). Even if the Award **did** violate EU law, this would not be sufficient to invoke the narrow public policy exception under Article V. *See Telenor Mobile Commc'ns AS v. Storm LLC*, 524 F. Supp.2d 332 (S.D.N.Y. 2007) (*abrogated on other grounds by Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384 (2d Cir. 2011)). In *Telenor*, the court made clear that the relevant inquiry when examining whether two conflicting decisions (*i.e.*, in this case, the compliance with the Award along with purported required compliance with *Achmea* and European Commission directives) is to determine whether

they are "'directly contrary' in such a way as to make compliance with one necessarily a violation of the other." *Telenor Mobile Commc'ns AS*, 524 F.Supp. 2d at 357.  But that is clearly not the case.  As noted above, *Achmea* did not address the ECT, or any multilateral treaty to which the EU was a member; it simply cannot be said that compliance with the Award in this case would "violate" EU law as announced by *Achmea*.[13]

Neither do the EC's post-hoc directives "invalidate" the arbitration agreement.  EC directives have no binding effect on an EU Member State's national laws, and instead are "legislative act[s] that set out a goal" for EU countries to achieve and "direct" Member States how to adopt certain measures into their national law.[14]

Finally, as discussed above, the CJEU, in the *CETA* Decision, recently clarified the legality of investor-state arbitration in circumstances like those presented here.  *CETA* held that an investment tribunal — one that, like the arbitral tribunal at issue here, lacks the ability to refer issues to the CJEU — does not violate EU law, because the EU has itself ratified the treaty creating the tribunal.  Frey Dec., Ex. E.  *CETA* makes clear what should already have been clear from *Achmea*: *Achmea* applies only to treaties between EU Member States, and not to treaties to which the EU is a member.

### 4.     The Foreign Compulsion Doctrine Is Irrelevant to these Proceedings

Spain also invokes the "foreign compulsion doctrine" as a reason why recognition of the Award is improper.  This is not, however, an enumerated defense under the New York Convention, and thus cannot be invoked as a basis to refuse recognition of the Award.  *See, e.g., Yusuf Ahmed*

---

[13] Nor is *Achmea* a decision that immediately has preclusive effect under European law.  Instead, each Member State is under a general obligation to comport its national laws to the CJEU's holdings, but unlike the U.S. Supreme Court, the CJEU does not provide direct appellate review of the decisions of EU courts and does not have the power to invalidate, through a process of judicial review, the laws or actions of EU Member States.  *See* Frey Dec., ¶¶ 14–18.

[14] European Union, "Regulations, Directives, and other acts," https://europa.eu/european-union/eu-law/legal-acts_en#directives (last visited Apr. 30, 2019).

*Alghanim & Sons v. Toys "R" Us, Inc.*, 126 F.3d 15, 23 (2d Cir. 1997) (holding that Article V grounds for non-recognition are exclusive).

Even if it were a defense to enforcement, it does not apply to the present circumstances. **First**, this doctrine is invoked to justify non-compliance with a U.S. order or statute if the "person in question appears likely to suffer severe sanctions for failing to comply with foreign law". Restatement (Fourth) of Foreign Relations Law § 442 (2018). Spain has not even attempted to show that it would suffer "severe sanctions" for complying with the Award.

**Second**, it is well established that there is "no general doctrine of international law that requires a state to excuse compliance with its law because of conflict with the law of another state," and instead allows courts to evaluate a statute on a case by case basis to consider if this defense applies based on the "text, history, and regulatory objectives of the statute." *Id.* To date, the majority of cases where courts have found this doctrine available to a party are nearly exclusively in the context of antitrust violations, and not in the context of summary proceedings regarding the enforcement of arbitral awards. *See, e.g*, *Interamerican Refining Corp. v. Texaco Maracaibo, Inc*., 307 F. Supp. 1291, 1298 (D. Del. 1970) (finding that "[w]ere compulsion not a defense, American firms abroad faced with a government order would have to choose one country or the other in which to do business. The Sherman Act does not go so far.").

**Third**, courts in this Circuit have rightfully questioned whether such a defense is even available to a foreign state, particularly where that state has, as Spain has done here, submitted to the arbitration that resulted in the award it claims is causing the "compulsion." *See Micula v. Gov't of Rom.*, No. 15 Misc. 107, 2015 WL 4643180, at *8 (S.D.N.Y. 2015) ("[a]ssuming that [] a sovereign like Romania could invoke the defense . . . it would nonetheless be unavailing" due to

"Romania's voluntary submission to the ICSID process through its treaty with Sweden") (*rev'd on other grounds*, 714 Fed. Appx. 18 (2d Cir. 2017) (summary order)).

### 5.      The Award Has Not Been Suspended Pursuant to Article V(1)(E)

Finally, Spain asks the Court to dismiss the Petition and refuse to recognize the Award pursuant to Article V(1)(e) of the New York Convention because it has been "suspended." Resp., at 14–15.  The Court should not do so, for three reasons.  **First**, the Order was made on an *ex parte* basis; as noted above, Petitioners have yet to even appear before the Svea Court.  Article V(1)(e) is grounded in notions of comity, and U.S. courts do not extend comity to interlocutory court orders obtained on an *ex parte* basis.  *See Banco Nacional De Mexico, S.A. v. Societe Generale*, 820 N.Y.S.2d 588, 592 (1st Dep't 2006) (finding that "even under the traditional comity analysis, there is no basis for the motion court to recognize the Mexican injunctions because they are non-final, *ex parte* orders of Mexican courts.").

**Second**, Spain has not established conclusively that the Award has been "suspended." While Spain, with the language of Article V(1)(e) in mind, makes that claim, the Svea Court has described the Order as imposing a **stay** of enforcement, which only concerns the procedural posture of the proceeding.  Ragnwaldh Dec., ¶¶ 9–11.  The Svea Court's imposition of a stay in Sweden does not justify dismissal of the Petition under Article V(2)(b), because there is no evidence before the Court that the Svea Court has given any consideration to the validity of the Award.  *See Cont'l Transfert Technique Ltd. v. Fed. Gov't of Nigeria*, 697 F. Supp.2d 46, 59 (D.D.C. 2010) (refusing to find award "suspended" due to Nigeria's failure to present any evidence that the High Court in Nigeria examined the substantive validity of the award in light of respondent obtaining an *ex parte* order suspending the award).

**Third**, Circuit law highlights the importance of ensuring that any suspension or annulment decision comports with public policy considerations in the United States before that decision is

23

recognized and afforded comity.  *See Pemex*, 832 F.3d at 106 (refusing to recognize annulment of an arbitral award that would deprive petitioners of a remedy).  Even if the Svea Court were to annul the Award, that annulment would not mandate denial of the Petition; the Court would remain free to recognize and enforce the Award if it were to find that the annulment decision was inconsistent with U.S. public policy.  *Id.*  Here, Petitioners respectfully submit that any annulment on the grounds advanced by Spain would require close scrutiny by this Court, since that annulment would be based on a retroactive finding by a European court that the ECT's arbitration provision — the plain text of which gives absolutely no notice to an EU investor that that investor might not be able to invoke it — is invalid.

### D.   Spain Has Failed to Provide any Justification for a Stay

Spain alternatively requests that the Court "stay enforcement proceedings pending resolution of the proceedings before the Swedish courts." Resp., at 25.  Spain has failed to even identify the test that governs its request; it should be denied on that basis alone.

Article VI of the New York Convention governs stays of recognition proceedings.  Where, as here, a party seeks a stay of recognition proceedings in deference to primary jurisdiction annulment proceedings, the Second Circuit's decision in *Europcar* provides the analytical framework.  *Europcar* requires district courts asked to grant a stay to apply a six-factor test focusing on: (1) the general goals of arbitration, including the expeditious resolution of disputes and the avoidance of protracted (and costly) litigation; (2) the status of the foreign proceedings and the length of time required to resolve those proceedings; (3) whether the award in question will receive greater scrutiny in foreign proceedings under a less deferential standard of review; (4) the characteristics of the foreign proceedings; (5) the balance of possible hardships of the parties; and finally (6) "any other circumstances" that would favor for or against adjournment. *Europcar*, 156 F.3d at 317–18.

The *Europcar* factors do not favor a stay.  First, the goal of the expeditious resolution of disputes weighs heavily against a stay.  Petitioners commenced this arbitration in 2015 and expended significant resources over the course of three years before obtaining the Award on November 14, 2018.  *See, e.g., G.E. Transp. S.P.A. v. Republic of Albania*, 693 F. Supp.2d 132, 139 (D.D.C. 2010) (refusing stay where the award "resulted from "a complex international arbitration ... [that] involved almost three years of preparation and work" weighed significantly in favor of confirmation).  Second, the current set-aside proceedings could take years to resolve, particularly in light of Respondent's request that the CJEU weigh in on the dispute.  Hope Dec., ¶5; Ragnwaldh Dec., ¶¶ 14–15.  Third, there is no evidence before the Court concerning the standard that will be applied to the Award in Sweden.  Fourth, the foreign proceedings seek to vacate the Award, which, under *Europcar*, weighs against a stay.  *Europcar*, 156 F.3d at 318. Fifth, Respondent has cited no hardship, while a stay would surely harm Petitioners, who continue to be deprived of the compensation provided by the Award.  In all, the "extraordinary circumstance" required to justify a stay is clearly not warranted under the present circumstances. *Europcar*, 156 F.3d at 315.

Should the Court be inclined to consider a stay, it should condition such any stay on Spain's posting of security for the full amount of the Award and accrued interest.  *See* New York Convention, Art. VI; *see also Caribbean Trading & Fidelity Corp. v. Nigerian Nat. Petroleum Corp.*, No. 90-Civ-4169 (JFK), 1990 WL 213030 at *8 (S.D.N.Y. 1990) (requiring respondent post over $10 million in security before granting a stay under Article VI).

Dated:  New York, New York
        May 6, 2018

                                    Respectfully submitted,


                                    James E. Berger

                                    KING & SPALDING LLP
                                    1185 Avenue of the Americas
                                    New York, New York, 10036
                                    Tel: 212-556-2202
                                    Fax: 212-556-2222
                                    *jberger@kslaw.com*

                                    *Attorneys for Petitioners*