**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

In the Matter of the Arbitration Between

FORESIGHT LUXEMBOURG SOLAR 1 S.À.R.L.
FORESIGHT LUXEMBOURG SOLAR 2 S.À.R.L.
GREENTECH ENERGY SYSTEMS A/S (NOW KNOWN AS ATHENA INVESTMENTS A/S)
GWM RENEWABLE ENERGY I S.P.A.
GWM RENEWABLE ENERGY II S.P.A.

Petitioners,

v.

THE KINGDOM OF SPAIN

Respondent.

**Case No.: 1:19-cv-03171-ER**

**PETITIONERS' SUR REPLY IN SUPPORT OF PETITION TO CONFIRM THE ARBITRAL AWARD**

James E. Berger
*jberger@kslaw.com*
KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York, 10036
Tel: 212-556-2202
Fax: 212-556-2222
New York, New York, 10022

*Attorneys for Petitioner*

## TABLE OF CONTENTS


**I. Spain Has Not Demonstrated That The Tribunal Erred In Finding That It Had Jurisdiction Under The Ect ..... 2**

**A. The Ect Establishes An Agreement In Fact To Arbitrate ..... 3**

**B. *Achmea* Did Not Retroactively Invalidate The Ect's Arbitration Agreement ..... 5**

**II. The Tribunal Did Not Exceed Its Jurisdiction ..... 7**

**III. The Award Does Not Violate U.S. Public Policy ..... 8**

**IV. The Award Has Not Been Suspended ..... 10**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Aguidas Chasidei Chabad of U.S. v. Russian Fed'n*,
528 F.3d 934 (D.C. Cir. 2008) .....3

*Application of Halpern*,
590 N.Y.S.2d 163 (Sup. Ct. 1992) .....4

*Banco Nacional De Mexico, S.A. v. Societe Generale*,
820 N.Y.S.2d 588 (1st Dep't 2006) .....10

*Cargill Int'l v. M/T Pavel Dybenko*,
991 F.2d 1012 (2d Cir. 1993) .....3

*Chevron Corp. v. Republic of Ecuador*,
795 F.3d 200, 205 (D.C. Cir. 2015), *aff'd*, No. 18-7047 (D.C. Cir. 2019) .....2

*Compagnie Noga D'Importation et D'Exportation, S.A. v. The Russian Fed'n*,
361 F.3d 676 (2d Cir. 2004) .....9

*Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion y Produccion*,
832 F.3d 92 (2d Cir. 2016) .....9

*Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*,
244 F.Supp. 3d 100 (D.D.C. 2017) .....8

*Espiritu Santo Holdings, LP v. L1bero Partners, LP*,
No. 19 Civ. 3930 (CM), 2019 WL 2240204 (S.D.N.Y. May 14, 2019) .....10

*Europcar Italia, S.p.A. v. Maeillano Tours, Inc.*,
156 F.3d 310 (2d Cir. 1998) .....9

*Int'l Klafter Co. v. Cont'l Cas. Co.*,
869 F.2d 96 (2d Cir. 1989) .....4

*Kirschner v. KPMG LLP*,
15 N.Y.3d 446 (2010) .....4

*In re MF Glob. Holdings Ltd.*,
561 B.R. 608 (Bankr. S.D.N.Y. 2016) .....10

*Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*,
508 F.2d 969 (2d Cir. 1974)....................8

*People v. Liebowtiz*,
531 N.Y.S.2d 719 (Co. Ct. 1988) ....................8

*Republic of Ecuador v. Chevron Corp.*,
638 F.3d 384 (2d Cir. 2011)....................3

*Stati v. Republic of Kazakhstan*,
199 F. Supp.3d 179 (D.D.C. 2016)....................2

*United Paperworks v. Misco, Inc.*,
484 U.S. 29 (1987)....................7

**Other Authorities**

*Eskosol S.p.A. in Liquidazione v. Italian Republic* , ICSID Case No. Arb/15/50, Decision on Request for Immediate Termination and Jurisdiction, (May 7, 2019) ....................3

*PL Holdings S.A.R.L. v. Republic of Poland*, Case No. T-8538-17, T-12033-17, Final Judgment, (Svea Ct. App. Feb. 22 2019 ....................6, 7

*Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C-284/16, CJEU Case C-284/16, Preliminary Ruling, Mar. 6, 2018 .................... *passim*

When Spain, alongside 53 other European and non-European states, including the European Union, signed the Energy Charter Treaty ("ECT") pursuant to which the arbitral award that is the subject of this petition was rendered (the "Award"), Spain gave its "unconditional consent to the submission of a dispute to international arbitration or conciliation[.]" Energy Charter Treaty, Dec. 17, 1994, 2080 U.N.T.S. 95, Art. 26, Declaration of Amy Frey (hereinafter "Frey Dec."), Ex. B, Dkt. 29. By its plain terms, the ECT creates a valid and enforceable agreement to arbitrate between Spain and Petitioners, who accepted Spain's "unconditional consent" to arbitrate by instituting the underlying arbitration. Spain does not dispute that (1) the clear text of the ECT creates an agreement to arbitrate, (2) the ECT does not contain any express carve-out for intra-EU disputes; and (3) the European Union itself is a party to the ECT and its arbitration agreement.

Nevertheless, Spain asks this Court to disregard the text of the ECT and to find that Spain "never intended" to agree to arbitrate disputes with investors from other EU Member States. Spain's position finds no support in the ECT's text and rests entirely on an advisory opinion by the Court of Justice of the European Union ("CJEU") concerning a dispute between different parties under a different treaty with a differently worded arbitration agreement and applicable law provision. *See Slowakische Republik (Slovak Republic) v. Achmea BV*, Case C-284/16, CJEU Case C-284/16, Preliminary Ruling, Mar. 6, 2018 ("*Achmea*"), Frey Dec., Ex. D, Dkt. 29. Spain presented the same argument to the arbitral tribunal, which rejected it, just as every other arbitral tribunal to consider it has done.

Even if the Court disagrees with the tribunal's ruling on jurisdiction and somehow considers that *Achmea* applies to "the type" of treaty that is at issue here, Spain has not provided any evidence demonstrating that the CJEU's ruling is self-executing or that it has the effect of automatically invalidating the agreement-in-fact to arbitrate that Spain clearly made. Spain bears the burden in this proceeding to demonstrate the agreement's invalidity, and its failure to proffer any evidence of

*Achmea*'s effect on the arbitral agreement's validity is a fatal defect in its argument that leaves it with nothing more than a series of "directives"—position statements by some EU countries disagreeing with a litany of arbitral awards that will impose financial obligations on them—by which to justify Spain's refusal to abide by the Award in this case. While it touts these position statements as "evidence" of EU law, Spain fails to mention that Sweden, the country whose courts will determine the Award's validity, declined to sign the position statement that claims *Achmea* extends to ECT disputes, and instead signed a position statement that recognizes that "the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty." Frey Dec., Ex. O, Dkt. 29, at 3.

None of Spain's arguments can overcome the plain language of the ECT, which governs the existence of the agreement, and which plainly establishes that a valid arbitration agreement was concluded. This Court should recognize the resulting Award forthwith.

## I. SPAIN HAS NOT DEMONSTRATED THAT THE TRIBUNAL ERRED IN FINDING THAT IT HAD JURISDICTION UNDER THE ECT

Spain does not dispute that (1) the plain language of the ECT states that Spain consents "unconditional[ly]" to the jurisdiction of an arbitral tribunal in cases brought by an investor of another ECT signatory state; (2) the ECT's arbitration agreement does not contain any carve-out or disconnection clause that excludes intra-EU disputes from Spain's consent to arbitration; and (3) Petitioners are investors from other ECT signatory states, who accepted Spain's treaty-based consent by commencing an arbitration under the ECT. This represents an agreement to arbitrate as a matter of both fact and law. *See, e.g.*, *Stati v. Republic of Kazakhstan*, 199 F. Supp.3d 179, 188 (D.D.C. 2016) (proffer of treaty containing arbitration provision, coupled with notice of arbitration, establishes prima facie evidence of arbitration agreement) (citing *Chevron Corp. v. Republic of Ecuador*, 795 F.3d 200, 205 (D.C. Cir. 2015), *aff'd*, No. 18-7047 (D.C. Cir. 2019) (unpublished));

*Republic of Ecuador v. Chevron Corp.*, 638 F.3d 384, 393 (2d Cir. 2011) ("[a]ll that is necessary to form an agreement to arbitrate is for one party to be a . . . signatory and the other to consent to arbitration of an investment dispute in accordance with the Treaty's terms.").

Spain's only recourse is to argue before this Court, as it did unsuccessfully before the arbitral tribunal, that in spite of the unambiguous text of the ECT, it "never intended" to consent to arbitrate disputes with investors of other EU member states, and to claim that the CJEU's opinion in *Achmea*—issued **24 years after the ECT came into force** and after numerous awards in intra-EU arbitrations under the ECT had been rendered—retroactively invalidates the ECT's arbitration agreement in intra-EU disputes. Spain has not even come close to meeting its heavy burden to demonstrate that no agreement to arbitrate was made. *Aguidas Chasidei Chabad of U.S. v. Russian Fed'n*, 528 F.3d 934, 940 (D.C. Cir. 2008) (finding that the foreign sovereign must establish the absence of the factual basis by a "preponderance of the evidence."); *Cargill Int'l v. M/T Pavel Dybenko*, 991 F.2d 1012, 1016 (2d Cir. 1993) ("[T]he ultimate burden of persuasion remains with the alleged foreign sovereign.").

### A. THE ECT ESTABLISHES AN AGREEMENT IN FACT TO ARBITRATE

Spain's argument that it never intended to arbitrate intra-EU disputes under the ECT is incredulous. To prevail on this argument, Spain would have to demonstrate by a preponderance of the evidence that both it and the EU executed the ECT, with no disconnection clause related to intra-EU disputes, with full knowledge of the alleged unlawfulness under EU law of entering into such an arbitration agreement. *See Chasidei Chabad*, 528 F.3d 934, 940 (D.C. Cir. 2008) (burden of persuasion rests with foreign sovereign who must establish objection by preponderance of the evidence). This is a remarkable proposition that would require this Court to find that the EU and EU Member States knowingly executed an unlawful agreement, thereby conceivably fraudulently inducing non-EU countries to sign the ECT in reliance on a plain text agreement to arbitrate that the

EU and its Members States in reality "never intended" to honor. Spain's position is preposterous. If Spain entered into the ECT knowing that it contained provisions that were allegedly unlawful under EU law, the doctrine of *in pari delicto* prevents Spain from relying on its own wrongdoing to escape its obligations. *See e.g.*, *Kirschner v. KPMG LLP*, 15 N.Y.3d 446, 464 (2010) (observing that the doctrine of *in pari delicto* serves the public policy of denying judicial relief to an admitted wrongdoer).

Critically, even if it were true that Spain ratified the ECT including the provision giving its "unconditional consent" to arbitrate never having intended to honor that consent, Spain has presented no evidence concerning Swedish law (the law that it claims governs the question of whether the arbitration agreement is valid, *see* Dkt. 38, at 5) and the extent to which Swedish law (a) permits retroactive invalidation of contracts, or (b) permits a party to rely on parol evidence of its subjective intent in order to overcome the plain text of the agreement. Under New York law, of course, parol evidence is only admissible where the plain text of the agreement is ambiguous. *See e.g.*, *Int'l Klafter Co. v. Cont'l Cas. Co.*, 869 F.2d 96, 100 (2d Cir. 1989) ("It is a fundamental principle of contract interpretation that, in the absence of ambiguity, the intent of the parties must be determined from their final writing and no parol evidence or extrinsic evidence is admissible."); *Application of Halpern*, 155 Misc. 2d 771, 774 (N.Y. Sup. Ct. 1992) ("The [parol evidence] rule prevents proof of an oral agreement to add to or vary a written agreement where the written understanding is clear and unambiguous.") (internal citations omitted). Spain does not claim that the ECT is ambiguous, so were New York law to apply, Spain's assertions regarding its subjective intent would be inadmissible. The wording of the ECT is crystal clear, and particularly where Spain has not adduced any evidence that Swedish law would allow the Court to consider Spain's contrary intent, that clear language controls this case.

### B. *ACHMEA* DID NOT RETROACTIVELY INVALIDATE THE ECT'S ARBITRATION AGREEMENT

Spain's position on *Achmea* is wrong, and its characterization of that ruling's effect on the arbitration agreement is grossly misleading. Nothing in the record establishes that the CJEU's decision in *Achmea* automatically invalidates the ECT's arbitration agreement among EU countries or that EU law prohibits or preempts intra-EU arbitration under the ECT, and no court or ECT arbitral tribunal (whether before or since *Achmea*) has ever held that it does. In fact, as recently as May 2019, another ECT tribunal rejected precisely this argument, joining at least 28 other ECT tribunals that have reached the same conclusion. *See* Second Declaration of Amy Frey, June 5, 2019, at ¶¶ 4-7 (hereinafter "Second Frey Dec.").

*First*, the *Achmea* opinion, by its own terms, was concerned only with intra-EU bilateral investment treaties ("BITs"). It arose from a dispute between a Dutch investor and Slovakia, based on a BIT between the Netherlands and Slovakia, and the holding focused on the wording of the choice of law clause contained in that particular BIT, which required the *Achmea* arbitral tribunal to apply EU law. Frey Dec., Dkt. 29, ¶¶ 39-42. The CJEU expressly clarified that its opinion applied only to BITs concluded between EU states and that other international agreements, including agreements entered by the EU, are "not in principle incompatible with EU law." *Id.* at ¶ 57. Nothing in the record indicates that *Achmea* applies outside the context of intra-EU BITs or that it has the automatic effect of invalidating arbitration clauses in multilateral treaties like the ECT that have been ratified by EU states, non-EU states, and the EU itself, and that are governed by international law, as opposed to EU, law.

Spain erroneously claims that "Petitioners try to distinguish the ECT from the bilateral treaty in *Achmea* because the former is multilateral. There is no cogent reason why *Achmea* should apply to a bilateral treaty but not where there are additional parties." Dkt. 38, at 7. Spain misses the point entirely. The distinction between bilateral and multilateral treaties derives from the CJEU itself;

Petitioners did not invent this distinction. *See* Frey Dec., Dkt. 29, at ¶ 10; *id.* at Ex. D, ¶¶ 57-8. Regardless, there is indeed a cogent explanation, which the ECT tribunal in *Vattenfall v. Germany* articulated succinctly when it rejected Germany's *Achmea*-based objection and the European Commission's *amicus* submission on the same:

> When States enter into international legal obligations under a multilateral treaty, *pacta sunt servanda*, and good faith require that the terms of that treaty have a single consistent meaning. States parties to a multilateral treaty are entitled to assume that the treaty means what it says, and that all States parties will be bound by the same terms. *It cannot be the case that the same words in the same treaty provision have a different meaning depending on the independent legal obligations entered into by one State or another, and depending on the parties to a particular dispute.* The need for coherence, and for a single unified interpretation of each treaty provision, is reflected in the priority given to the text of the treaty itself over the other contextual elements under Article 31 VCLT [*i.e.*, the Vienna Convention of the Law of Treaties]."

Frey Dec., at Ex. F, Dkt. 29, ¶ 156 (emphasis added).

*Second*, even if the Court considered that *Achmea* could be extended to the ECT (which the CJEU itself expressly stated it did not do), Spain has presented no evidence that the CJEU's opinion is self-executing or that it automatically invalidates the ECT's arbitration agreement. Only the Svea Court of Appeal in Sweden is capable of holding that the arbitration agreement at issue in this case is void. It is indisputable that it has not done so. Second Declaration of Jakob Ragnwaldh, June 5, 2019, ¶ 16 (hereinafter "Second Ragnwaldh Dec.").

*Third*, there is no Swedish public policy against intra-EU arbitration, as the Svea Court of Appeal recently confirmed. In *PL Holdings S.A.R.L. v. Republic of Poland*, PL Holdings obtained an arbitral award in its favor against Poland under a BIT between Poland and the Belgium-Luxemburg Economic Union ("BLEU"). Case No. T-8538-17, T-12033-17, Final Judgment, (Svea Ct. App. Feb. 22 2019), Second Ragnwaldh Dec., Ex. B. Poland applied to set aside the award on the basis, *inter alia*, that it violated EU law and could not be recognized in line with the *Achmea* decision. The Svea Court dismissed this argument, finding that Poland had not raised the intra-EU

objection in a timely fashion. This confirms that "in Sweden, public policy is not a reason for setting aside an award issued under intra-EU BITs." Second Ragnwaldh Dec., ¶ 13.

*Fourth*, there is no principle of EU law or Swedish law (whether based on *Achmea* or otherwise) that would automatically invalidate or require the Swedish Court to invalidate the ECT's arbitration agreement. The ECT itself is EU law, making it highly unlikely that the Swedish Court would invalidate a provision thereof. Second Frey Dec., ¶ 12. Notably, while some EU Member States have made a political statement that the ECT should not apply to intra-EU disputes, Sweden itself refused to sign that declaration. Frey Dec., Ex. O, Dkt. 29. Instead, Sweden signed a declaration that expressly notes that "the *Achmea* judgment is silent on the investor-state arbitration clause in the Energy Charter Treaty." *Id.* at 3.

In short, Spain's objection on the basis of EU law and the *Achmea* decision rings hollow.

## II. THE TRIBUNAL DID NOT EXCEED ITS JURISDICTION

Spain's position on "state aid" fares no better. The arbitral tribunal's jurisdiction and powers in the arbitration were fixed by the ECT and the applicable procedural rules (the rules of the Stockholm Chamber of Commerce ("SCC")), which permit the tribunal to award the remedies, including monetary damages, that it considers appropriate. *See* Frey Dec., Ex. A, Dkt. 29; *id.* at Ex. B, art. 26(8). Pursuant to these rules, the tribunal heard evidence on whether Spain breached its international law obligations, held that it did, and awarded compensatory damages. Spain presented its objection based on "state aid" to the tribunal, which considered and rejected it following several rounds of written submissions and an oral hearing. This is precisely what the ECT empowered, if not obligated, the tribunal to do, and any argument that this somehow constituted an excess of power is frivolous. *See United Paperworks v. Misco, Inc.*, 484 U.S. 29, 38 (1987) (finding that courts have no authority to disagree with arbitrator's honest finding in respect of remedies); *Parsons & Whittemore Overseas Co., Inc. v. Societe Generale de L'Industrie du Papier (RAKTA)*, 508 F.2d

969, 974, 976 (2d Cir. 1974) (rejecting argument that arbitral tribunal exceeded powers by awarding damages and holding that this exception to enforcement must be "construed narrowly" and given a "strict reading"); *Crystallex Int'l Corp. v. Bolivarian Republic of Venez.*, 244 F.Supp. 3d 100, 120 (D.D.C. 2017) (applying deferential standard in holding that tribunal's damages calculation did not exceed the scope of its authority).

If Spain's position were given credence, any state could invoke its own internal law to circumvent an unfavorable arbitral award.[1] No state can invoke its internal law to escape its international legal obligations arising from treaty obligations. In the United States, this principle is recognized in the Constitution. *People v. Liebowtiz*, 531 N.Y.S.2d 719, 721 (Co. Ct. 1988) ("Of course, a treaty to which the government of the United States is a party is the supreme law of the land and "... the judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." (*citing* U.S. Const. Art. VI)). In international law, the principle is enshrined in the International Law Commission's Articles on State Responsibility. Second Frey Dec., Ex. B, Art. 3 (characterization of measure as lawful under internal law does not affect characterization as unlawful under international law). Respondent has not presented a single precedent in which a court permitted a state to escape liability by invoking its internal law to excuse compliance with an international treaty-based arbitral award.

## III. THE AWARD DOES NOT VIOLATE U.S. PUBLIC POLICY

Spain's argument on public policy rests on its misleading claim that "it is uncontested that an order requiring the award's payment would direct Spain to violate EU law." Dkt. 38, at 10.

---

1 Spain claims, without support, that "the EU Treaties are international law." Dkt. 38, at 10, n. 5. But the EU Treaties, which were formed and operate to govern a federation, are no more "international law" than the U.S. Constitution, which was an agreement among sovereign states to form a republic. It is, certainly for purposes of this case, a part of the national law of the EU, not "international law" that could govern cases between non-EU parties. A recent arbitral award rendered under the ECT confirms that EU law "is not general international law, but rather a species of international law." *Eskosol S.p.A. in Liquidazione v. Italian Republic*, ICSID Case No. ARB/15/50, Decision on Italy's Request for Immediate Termination and Jurisdiction, (May 7, 2019), Second Frey Dec., Ex. A, ¶¶ 114-15.

While the EU may have decided to label arbitral awards against EU Member States "state aid," this does not render compliance with the awards *ipso facto* offensive to U.S public policy.

The public policy defense to recognition must be construed narrowly, and recognition should only be denied on this ground where enforcement "would violate [the forum state's] 'most basic notions of morality and justice.'" *E.g. Europcar Italia, S.p.A. v. Maeillano Tours, Inc.*, 156 F.3d 310, 315 (2d Cir. 1998) (internal citations omitted). There is no U.S. public policy that condones a state's non-compliance with its international legal obligations in favor of compliance with *post-hoc* domestic law or, less so, declarations of illegality, and Respondent has pointed to none. Respondent's reliance on the principle of comity or the public policy exception to enforcing illegal awards are thus beside the point. The only public policies that are relevant here are the strong U.S. public policy (and treaty obligation of the United States under the New York Convention) in favor of enforcing arbitral awards. *See, e.g., Compagnie Noga D'Importation et D'Exportation, S.A. v. The Russian Fed'n*, 361 F.3d 676, 683 (2d Cir. 2004) (noting that the high burden of proving a defense is "imposed because 'the public policy in favor of international arbitration is strong.'") (internal citations omitted).

The Second Circuit's decision in *Corporacion Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploracion y Produccion*, 832 F.3d 92 (2d Cir. 2016) ("*Pemex*") is instructive notwithstanding Respondent's erroneous blanket assertion that *Pemex* "bears no resemblance to this [case]". Dkt. 38, at 4. In *Pemex*, the Mexican court annulled an arbitration award against a state-owned company based on a new law that it applied retroactively to vitiate the underlying arbitration agreement. The Second Circuit nevertheless recognized the annulled award. The Court declined to accept Pemex's argument that it should refuse to recognize the award on the basis of comity because the Mexican court had annulled it. The Court held that retroactive application of Mexico's internal law was offensive to basic notions of justice. Similarly here, Spain

asks the Court to refuse to recognize the Award because it claims that complying with the Award is incompatible with EU law based on a CJEU decision rendered 24 years after the ECT (and therefore Spain's offer to arbitrate, and several years after Petitioners' acceptance of that offer) became effective. The use of internal law (that evolved over two decades after Spain agreed to arbitrate ECT disputes, no less) to excuse non-compliance with international obligations is not a public policy the U.S. (or any known state) has espoused.

## IV. THE AWARD HAS NOT BEEN SUSPENDED

Finally, the Court should not refuse to recognize the Award because Spain claims that it has been "suspended." Petitioners addressed Spain's argument on suspension in their Reply in Support of Petition to Confirm the Arbitral Award (Dkt. 28) and respectfully refer the Court to § III.C.5 thereof. In a nutshell, the Order of the Swedish Court, made on an *ex parte* basis, is not entitled to comity. *See Banco Nacional De Mexico, S.A. v. Societe Generale*, 820 N.Y.S.2d 588, 592 (1st Dep't 2006) (finding that "even under the traditional comity analysis, there is no basis for the motion court to recognize the Mexican injunctions because they are non-final, *ex parte* orders of Mexican courts."); *Espiritu Santo Holdings, LP v. L1bero Partners, LP*, No. 19 Civ. 3930 (CM), 2019 WL 2240204, *15 (S.D.N.Y. May 14, 2019) ("Moreover, as a general matter, neither federal nor New York courts extend comity to non-final, non-merits orders, including specifically preliminary injunctions. The fact that such orders are entered without providing both sides a full and fair opportunity to litigate is, of course, one important reason not to pay them any mind.") (internal citations omitted); *In re MF Glob. Holdings Ltd.*, 561 B.R. 608, 628-29 (Bankr. S.D.N.Y. 2016) (holding that comity depends on the "opportunity for a full and fair trial.") (internal citations omitted). The Award is valid, and until the Swedish Court hears from all parties and adjudicates Spain's set aside request, it would be premature to decline to recognize the Award.

Dated: New York, New York
June 5, 2018

Respectfully submitted,

*/s/ James E. Berger*
James E. Berger

KING & SPALDING LLP
1185 Avenue of the Americas
New York, New York, 10036
Tel: 212-556-2202
Fax: 212-556-2222
*jberger@kslaw.com*

*Attorneys for Petitioner*