UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Foresight Luxembourg Solar 1 S.A.R.L., Foresight Luxembourg Solar 2 S.A.R.L., Greentech Energy Systems A/S, now known as Athena Investments A/S, GWM Renewable Energy I S.P.A., and GWM Renewable Energy II S.P.A., <br><br> Petitioners, <br><br> – against – <br><br> Kingdom of Spain, <br><br> Respondent. | **OPINION & ORDER** <br> 19 Civ. 3171 (ER) |

Ramos, D.J.:

    Petitioners, investors from European Union ("EU") Member States, commenced this action in the Supreme Court of New York County against the Kingdom of Spain to confirm an arbitral award rendered by the Arbitration Institute of the Stockholm Chamber of Commerce, an international tribunal located in Sweden. This arbitral award was made pursuant to the dispute resolution provisions of the Energy Charter Treaty ("ECT"), Doc. 17, 1994, 2080 U.N.T.S. 95, an international investment agreement that establishes a multilateral framework for cross-border cooperation in the energy industry. Petitioners bring this claim in the United States pursuant to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral awards, (June 10, 1958), 21 U.S.T. 2517, 330 U.N.T.S. 38 ("New York Convention") and Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. §§ 201 *et seq.*

    The Kingdom of Spain ("Respondent" or "Spain") removed the action to this Court from the Supreme Court of New York County on April 10, 2019 pursuant to 9 U.S.C. § 205 and 28 U.S.C. § 1441(d). Doc. 1. Spain now seeks to transfer the action to the United States District

Court for the District of Columbia ("District of Columbia"), or in the alternative, stay the action pending the resolution of a set-aside proceeding in Sweden. For the reasons set forth below, the motion to transfer is GRANTED and the motion to stay the application is respectfully referred to the transferee court.

I.   BACKGROUND

Spain signed the ECT on December 17, 1994 and ratified it on December 11, 1997. Doc. 1-1, 4. The ECT entered into force in Spain on April 16, 1998, making it a contracting party to the ECT. *Id.* Article 26 of the ECT provides that each contracting party gives unconditional consent to submit investor-state treaty claims to international arbitration or conciliation. *Id.* Petitioners are Foresight Luxembourg Solar 1 S.A.R.L. and Foresight Luxembourg Solar 2 S.A.R.L., two private limited companies from Luxembourg; Greentech Energy Systems A/S, a publicly listed company incorporated in Denmark; GWM Renewable Energy I S.P.A., an Italian joint stock public company; and GWM Renewable Energy II S.P.A.,[1] an Italian limited liability company. *Id.* at 2–3. Luxembourg, Italy,[2] and Denmark also became contracting parties on April 16, 1998 when the ECT entered into force in each respective country. *Id.* at 4–5.

In 2007, Spain established a regime for investment in the renewable energy field that guaranteed certain producers fixed prices for energy produced through a feed-in tariff ("FiT"). Doc. 42, 3. Its purpose was to induce private investment in renewable energy facilities in order to enable Spain to meet national and EU level targets for electricity generation from renewable energy sources by 2010. Doc. 1-1, 5. Between May 2009 and May 2010, Petitioners acquired

---

[1] Since the filing of the Request for Arbitration, GWM II changed its form from an Italian public joint stock company to an Italian limited liability company known as "GWM Renewable Energy II S.R.L." Doc. 1-1, 3.

[2] Italy withdrew from the ECT on December 31, 2014, however, all investments existing at the time of its renunciation of the ECT remain protected and are allowed to use the dispute resolution provisions until 2036. *Id.* at 5.

three Spanish companies that operated solar power plants which were given various privileges such as priority of access and dispatch to the electricity grid. *Id.* at 7. Spain experienced unsustainable growth of the tariff deficit and adopted new decrees between 2010 and 2014 to remedy that. *Id.* These reforms included adding a 7% tax on all electricity generation revenue, capping the annual operating hours for which these solar power plants could receive a FiT, and switching the model of the support scheme that required renewable energy facilities to sell electricity on the wholesale market. *Id.* at 8. The net effect of these new regulations drastically reduced the profitability and value of Petitioners' investment and in 2015 and 2016, they sold their investments in the solar power plants at a substantial loss. *Id.* at 9.

On November 2, 2015, Petitioners commenced arbitration proceedings against Spain in Sweden, a signatory to the New York Convention. Doc. 42, 3. Petitioners invoked the dispute settlement provision in Article 26 of the ECT, which allowed them to arbitrate their claims in Stockholm, subjecting the proceedings to Swedish law, including EU law, and judicial supervision by the courts of Sweden. *Id.* Spain presented two objections to the arbitral tribunal's jurisdiction: (1) that the dispute was an intra-EU dispute and EU law forbids EU Member States from arbitrating disputes with EU investors, and (2) that a 2012 tax introduced on the production of electrical energy is a legitimate taxation measure, subject to the carve-out clause in the ECT. *Id.* at 10.

The arbitral tribunal rejected the first jurisdictional objection on grounds that the tribunal was "not aware of a single award that has found 'intra-EU' disputes to be excluded from the scope of Article 26(1) [of the] ECT," while in contrast, there had been eighteen awards in which jurisdiction over intra-EU investment treaty disputes had been upheld. Doc. 1-1, 9. The tribunal found that while the Petitioners did not have a legitimate expectation to receive the precise FiT

3

specified in the original regulation for the lifetime of their solar power plants, they did have a legitimate expectation that the legal and regulatory framework would not be fundamentally and abruptly altered. *Id.* On November 14, 2018, the tribunal issued an award, accepting Petitioners' claim of breach of the ECT and awarding them €39 million, plus costs and interests (the "award").[3] *Id.* at 11.

One month later on December 14, 2018, Petitioners commenced this action in the Supreme Court of New York County to confirm the award pursuant to the New York Convention, which provides an exemption to sovereign immunity as described in the FSIA. Doc. 5-1, 2. Two months later, on February 14, 2019, Spain applied to the Svea Court of Appeal ("Svea Court") in Sweden to set aside the award, claiming several defects in the award pursuant to the Swedish Arbitration Act ("SAA"). *Id.* at 4. Spain simultaneously requested, on an *ex parte* basis, that the Svea Court suspend the award until judgment is rendered. *Id.* at 5.

Spain's grounds for relief included that: (1) the award was not covered by a valid arbitration agreement between the parties; (2) even if Article 26 of the ECT were deemed to apply between EU Member States, the award must still be set aside because Article 26 would violate higher ranking rules of EU law; (3) by awarding state aid, the award determines an issue which, under Swedish law, may not be decided by arbitrators; (4) the award is incompatible with the basic principles of the Swedish legal system; and (5) the award is contrary to legal order in Sweden. Doc. 12, 2.

The Svea Court granted the request on February 21, 2019 when it issued a provisional, summary order suspending the award until further notice. *Id.*; Doc. 12-1. Spain submitted a declaration from the former Chief Justice of the Swedish Supreme Court, Stefan Lindskog

---

[3] *See* Doc. 1-1, 47 for a copy of the arbitral tribunal's decision.

4

("Lindskog"), who avers that when a Swedish Court of Appeal suspends an award it is also making a prognosis on the final outcome of the challenge and that it is "probable [] that the award is invalid or will be set aside by the Court." Doc. 43, 8. In Lindskog's experience, suspension orders are typically terse but are only ordered after the Court of Appeal has thoroughly analyzed whether the award is invalid or should be set aside. *Id.* at 9.

Spain removed the action to this Court on April 10, 2019. Doc. 5. On April 17, 2019, Spain responded to the Petition arguing that under a judgment from the Court of Justice of the European Union ("CJEU"), *Slovak Republic v. Achmea B.V.*, Case C284/16, March 6, 2018, ECLI:EU:C:2018:158 ("*Achmea* decision"), the ECT does not have intra-EU application because EU law precludes investor-state arbitration for intra-EU disputes. Doc. 11, 23–26. Following that logic, there was no offer to arbitrate from Spain that Petitioners could accept and thus the underlying arbitration was invalid. *Id.* As a result, Spain argues, this Court lacks subject matter jurisdiction over it because Petitioners cannot enforce an invalid arbitration award in the United States. *Id.* at 26–29. Spain also argues this Court lacks personal jurisdiction over it. Doc. 42, 6. Allegedly, Petitioners failed to properly serve Spain under § 1608(a) of the FSIA, which provides the exclusive means for serving foreign states. Doc. 11, 21. On May 3, 2019, the European Union filed an *amicus curia* supporting Spain's position that this Court lacks jurisdiction over the claims. Doc. 27, 7.

Should this Court find that it has subject matter jurisdiction over the claims and personal jurisdiction over Spain, Spain argues that the case should be transferred to the District of Columbia which has original jurisdiction over cases involving foreign states. Doc. 42; *see* 28 U.S.C. § 1391(f)(4). In support of its motion to transfer the case, Spain alleges that it is currently defending five petitions, including this one, brought by nationals of other EU states in the United States

5

who are seeking confirmation and/or enforcement of arbitral awards ostensibly rendered pursuant to the ECT.  Doc. 40, 1.  The other four petitions are pending in the District of Columbia and present common dispositive issues.  *Id.* at 3.  But only one of those petitions, *Novenergia II – Energy & Environment (SCA) v. Kingdom of Spain*, No. 18-cv-1148-TSC, ECF No. 1 (D.D.C., filed May 16, 2018) ("*Novenergia II*"), was brought pursuant to the New York Convention.[4]  *Id.* at 1–2.  The others seek enforcement under a separate treaty, the Convention on the Settlement of Investment Disputes (the "ICSID Convention") between states and nationals of other states.  Doc. 55, 6.  In the alternative, Spain requests that the Court stay this action pursuant to the New York Convention pending resolution of the annulment proceedings before the Svea Court.  Doc. 42, 1.

## II. LEGAL STANDARD

District courts are authorized to transfer cases to any other district where the case might have been brought when a transfer serves the convenience of parties and witnesses or is in the interest of justice.  28 U.S.C. § 1404(a).  When a court lacks personal jurisdiction over defendants, it may still transfer the case to another district in the interest of justice.  *See* 28 U.S.C. § 1406(a).  Defendants bear the burden of establishing that plaintiff's choice of forum should be overturned.  *Wohlbach v. Ziady*, No. 17 CIV. 5790 (ER), 2018 WL 3611928, at *4 (S.D.N.Y. July 27, 2018) (citing *Alexander & Alexander, Inc. v. Donald F. Muldoon & Co.*, 685 F. Supp. 346, 349 (S.D.N.Y. 1988)).

To determine whether transfer is warranted, courts perform a two-step inquiry:  (1) determine whether the action might have been brought in the transferee court, and (2) evaluate

---

[4] The Court takes judicial notice that *Novenergia II* was decided by the District of Columbia on January 27, 2020. Doc. 63; *Novenergia II - Energy & Env't (SCA) v. Kingdom of Spain*, No. 18-CV-01148 (TSC), 2020 WL 417794, at *3 (D.D.C. Jan. 27, 2020).  The Court granted Spain's request for a stay but declined to require it to post security. *Id.* at * 6.

whether transfer is warranted using several factors concerning the convenience of transfer and the interests of justice. *In re Collins & Aikman Corp. Sec. Litig.*, 438 F. Supp. 2d 392, 394 (S.D.N.Y. 2006). At the second step, the factors courts may consider include:

> (1) the convenience of the witnesses; (2) the convenience of the parties; (3) the location of relevant documents and the relative ease of access to sources of proof; (4) the locus of operative facts; (5) the availability of process to compel the attendance of unwilling witnesses; (6) the relative means of the parties; (7) the forum's familiarity with governing law; (8) the weight accorded to plaintiff's choice of forum; and (9) trial efficiency and the interests of justice.

*Id.* "There is no rigid formula for balancing these factors and no single one of them is determinative. Instead, weighing the balance is essentially an equitable task left to the Court's discretion." *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561 (S.D.N.Y. 2000) (internal citations and quotations omitted).

### III.   DISCUSSION

Generally, the FSIA provides that civil actions against a foreign state may be brought in four different ways:

> (1) in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated;
>
> (2) in any judicial district in which the vessel or cargo of a foreign state is situated, if the claim is asserted under section 1605(b) of this title;
>
> (3) in any judicial district in which the agency or instrumentality is licensed to do business or is doing business, if the action is brought against an agency or instrumentality of a foreign state as defined in section 1603(b) of this title; or
>
> (4) in the United States District Court for the District of Columbia if the action is brought against a foreign state or political subdivision thereof.

28 U.S.C.A. § 1391(f) (West).  Spain seeks to transfer the case to the District of Columbia, "the dedicated venue for actions against foreign states," pursuant to § 1391(f)(4).  *Bettis v. Islamic Republic of Iran*, 315 F.3d 325, 332 (D.C. Cir. 2003).

The Second Circuit has held that when a case is removed, the removal statute (§ 1441), and not the ordinary federal venue statute (§ 1391), governs.  *PT United Can Co. Ltd. v. Crown Cork & Seal Co., Inc.*, 138 F.3d 65, 72 (2d Cir. 1998).  Thus, a party may challenge removal but not venue outright as if the case had originally been brought in the district court.  *Id.*  Because the Southern District of New York encompasses New York County, where the state action was pending at the time of removal, it is a proper venue under § 1441(d).  Doc. 5, 3.  However, while § 1391 does not determine venue in removed cases, a party may request a discretionary transfer to a more convenient district court forum under the transfer provision, § 1404.  *PT United Can*, 138 F.3d at 72.

Section 1404(a) allows an action to be transferred to another district where that action might have been brought, "[f]or the convenience of parties and witnesses, in the interest of justice."  *See Smith v. Ouimet*, No. 16-CV-184 (JLC), 2016 WL 3020825, at *2 (S.D.N.Y. May 19, 2016) (holding removed case may still be subject to transfer under § 1404(a) to district in which action could have potentially been commenced); *see Translinear*, 538 F. Supp. at 143 (holding appropriate basis for transfer in removed cases is § 1404(a)).  There is no dispute that the action could have been brought in the District of Columbia, satisfying the first step of the transfer inquiry.

Petitioners rely on *Translinear, Inc. v. Republic of Haiti*, 538 F. Supp. 141, 144 (D.D.C. 1982) to oppose transfer.  The case was brought in Texas state court, removed to the Southern District of Texas, and then transferred to the District of Columbia.  Although, the general venue

statute does not apply in removed cases, the district court that received the case from state court may transfer the case to a court that complies with § 1391(f). *Id.* at 144 n.2; *see also* § 1390(c) (providing federal venue statute does not determine district court to which civil action may be removed from state court but governs transfer of removed action between district courts). For example, the *Translineal* court ultimately transferred the case to the Northern District of Texas after finding that a substantial part of the events or omissions giving rise to the case occurred there, pursuant to § 1391(f)(1). 538 F. Supp. at 145.

Here, § 1391(f)(1)–(3) do not apply as none of the events giving rise to the action occurred in this District, and there is no vessel or cargo or agency or instrumentality of a foreign state at issue. Section 1394(f)(4) does apply because this lawsuit is against a foreign state and Congress has designated the District of Columbia as the "dedicated venue" for civil cases involving foreign states. *Bettis*, 315 F.3d at 332. In two related cases brought against the Italian Republic, Judge Louis L. Stanton, found that in a civil action against foreign state, in which no party is a citizen or resident of the United States, and no event or omission giving rise to the claim or any other aspect of the claim has any connection to New York, transfer to the District of Columbia is appropriate. *See Greentech Energy Systems A/S, et al. v. Italian Republic*, Case No. 19-cv-4398-LLS (S.D.N.Y.); *CEF Energia, B.V. v. Italian Republic*, Case No. 19-cv-9153-LLS (S.D.N.Y.).

Spain argues that transfer to the District of Columbia would be convenient and promote "the interests of justice." *Collins*, 438 F. Supp. 2d at 394; § 1404(a). As Spain and the Petitioners are foreign parties, none of the events in the action occurred in the United States, and arbitral confirmation proceedings are summary in nature, the majority of the convenience and interest of justice factors are neutral. Doc. 40, 5–6. Spain focused on only two of the factors, which it

9

deemed determinative to the case: trial efficiency and deference to petitioner's choice of forum. *Id.* at 6.

Because there are parallel matters underway in the District of Columbia, judicial economy favors a transfer. *Id.* (citing *Gokhberg v. PNC Fin. Servs. Grp., Inc.*, No. 15-cv-6001-LTS, 2015 U.S. Dist. LEXIS 170075, at *6 (S.D.N.Y. Dec. 21, 2015)). If this case is transferred to the District of Columbia, Spain will allegedly seek to consolidate it with *Novenergia II*, a case based on the New York Convention, thus avoiding the "wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Id.* (citing *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960)). The District of Columbia stayed *Novernergia II* on January 27, 2020, pending resolution of set-aside proceedings in Sweden that raise substantially the same questions of law as in this case. Doc. 63. Accordingly, judicial economy favors a transfer.

Finally, a plaintiff's choice of forum lacks controlling weight when they file in state court and the case gets removed against their will to a federal court with no connection whatsoever to the dispute. *Young v. Starbucks Coffee Co.*, No. 01-cv-4566-GEL, 2002 U.S. Dist. LEXIS 2189, at *5 (S.D.N.Y. Feb. 8, 2002). Also, a plaintiff's selection of forum is "given less weight where, as here, the plaintiff is not a resident of the forum and the cause of action is minimally connected with the forum." *Id.* at *3 (citing *Eichenholtz v. Brennan*, 677 F. Supp. 198, 201 (S.D.N.Y. 1988)); *see also Emp'rs Ins. of Wausau v. Fox Entm't Grp., Inc.*, 522 F.3d 271, 276 (2d Cir. 2008) (acknowledging *de minimis* connection to chosen forum is one characteristic of forum shopping).

The jurisdiction provided by the New York Convention is the only link between the parties and this Court. *In re Arbitration between Monegasque De Reassurances S.A.M. v. Nak Naftogaz of Ukraine*, 311 F.3d 488, 498–99 (2d Cir. 2002). Petitioners are all EU nationals,

suing Spain, a foreign state, seeking to confirm an arbitral award rendered in Sweden by an international tribunal based on the provisions in the ECT. Doc. 40, 7. Accordingly, the Court concludes that the balance of convenience and the interests of justice favor the transferee court. *Translineal*, 538 F. Supp. At 145. Thus, the motion to transfer the case is GRANTED.

## IV. CONCLUSION

For the reasons set forth above, the Court GRANTS the motion to transfer the case to the District of Columbia; the application to stay the case is respectfully referred to that court. The Clerk of Court is respectfully directed to terminate the motions, Docs. 39, 41, and transfer the case to the United States District Court for the District of Columbia.

It is SO ORDERED.

Dated: March 30, 2020
New York, New York

Edgardo Ramos, U.S.D.J.